Donna Welch, individually and as administratrix of the estate of David Welch, appeals from the Montgomery Circuit Court's summary judgment for Montgomery Eye Physicians. We affirm.
 Facts
Montgomery Eye Physicians, P.C. ("MEP"), is a professional corporation organized and existing under the corporate laws of Alabama. All of the shareholders of MEP are medical doctors authorized to practice medicine in the State of Alabama. Dr. David Welch, Donna Welch's husband, was licensed under Alabama law to practice optometry; Dr. Welch was not a physician or a medical doctor. Under Alabama law, all shareholders of a professional corporation organized for the purpose of rendering medical services must be medical doctors.
Before his association with MEP, Dr. Welch had practiced optometry for approximately 15 years, building a substantial *Page 839 
patient base. In 1994, Dr. Welch, who was operating as Welch Associates, P.C., approached the principals of MEP to discuss the possibility of adding Dr. Welch's optometry practice to the ophthalmology practice of MEP. Prescription Eyewear, Inc., is a corporation organized under the laws of Alabama; the principals of MEP were also the shareholders in Prescription Eyewear. On May 18, 1994, Welch Associates, P.C., and Prescription Eyewear, Inc., entered into a lease agreement pursuant to which Dr. Welch would lease from MEP the premises MEP had dedicated to Prescription Eyewear. When this arrangement proved to be mutually beneficial, Dr. Welch suggested that MEP and Dr. Welch enter into a formal employment contract.
On June 14, 1995, Dr. Welch entered into an employment contract with MEP; the contract named Dr. Welch as the optometrist and department coordinator for the contact lens clinic, a division of Prescription Eyewear, and Prescription Eyewear. This contract extended from June 1, 1995, through September 30, 1996, and provided a salary for Dr. Welch of $178,600 per year. The employment contract also provided that Dr. Welch would be paid a bonus based on the net profits of the contact lens clinic and Prescription Eyewear. The contract further provided that if Dr. Welch's employment was terminated for any reason, Dr. Welch could not remove any patient files or records from MEP's premises and could not solicit any patients from MEP without the permission of MEP. This 1995-1996 contract also stated that if Dr. Welch's employment was terminated, MEP would provide Dr. Welch with a list of the contact lens patients with whom he had established a professional relationship before his association with MEP and whom he would not be prohibited from contacting.
In conjunction with the execution of the employment contract, MEP purchased nearly all of the furniture, fixtures, and equipment Dr. Welch had used in his solo optometry practice. MEP paid Dr. Welch $71,848.63 for those items, which was the agreed upon fair market value.
On October 16, 1996, Dr. Welch and MEP entered into a second employment agreement for the period beginning October 1, 1996, through September 30, 1997. Under the terms of that contract, Dr. Welch was to receive a salary equal to 68 percent of the net profits of the contact lens clinic, along with other specified benefits. Like the first employment contract, this contract provided that if the employment relationship between MEP and Dr. Welch was terminated for any reason, Dr. Welch could not remove any of the patient files or records from the premises of MEP and could not solicit any patients from MEP, except for those patients with whom he had developed a relationship before his association with MEP.
A third and final employment contract was entered into on October 29, 1997, for the period of October 1, 1997, through September 30, 2002. Under this agreement, Dr. Welch would continue to receive a salary of 68 percent of the net profits of the contact lens clinic. The contract also contained the same restrictions included in the two previous employment contracts regarding the removal of patient records and the solicitation of patients from MEP. The third contract further provided for the possibility of disability or illness:
 "In the event because of illness or injury disabling Employee and preventing Employee from carrying out his duties under this contract, Employer agrees to pay Employee's salary and bonus for a period not to exceed six (6) months, but in no event beyond the date of termination of this Contract, less the *Page 840 
salary including matching and withholding contributions and benefits required to be paid by Employer to hire a professionally competent and qualified optometrist as a replacement."
On October 30, 1998, Dr. Welch was diagnosed with terminal cancer. After he was diagnosed, Dr. Welch began to receive disability-insurance benefits, and he made arrangements for Dr. Fred Setzer, an optometrist practicing in Birmingham, to begin working for MEP in its contact lens/optometry division in January 1999. Dr. Setzer was to serve as the replacement optometrist pursuant to the third employment contract.
Because of Dr. Welch's failing health, the third and final employment contract between MEP and Dr. Welch was terminated, and the parties orally agreed to a consulting arrangement between Dr. Welch and MEP. The oral agreement provided that Dr. Welch was to be paid a monthly fee for consultations with MEP. The exact amount of the monthly fee is unclear from the record, but it appears to have been between $1,000 and $2,500 a month.
In December 1998, Dr. Welch prepared and mailed a letter to all of the patients he had treated while he was associated with MEP, informing them that he was taking a medical leave of absence and urging them to continue to visit MEP for their eyecare. Furthermore, after his diagnosis, Dr. Welch approached MEP about MEP's purchasing his optometry practice, which had not been done during his association with MEP. After he approached MEP about purchasing his practice and before any documents were executed, Dr. Welch died. MEP contends that it never agreed to purchase Dr. Welch's practice. No purchase agreement exists; only an unsigned noncompetition agreement in which Dr. Welch agreed not to compete with MEP for certain patients has been located. MEP argues that the unsigned noncompetition agreement does not prove the existence of an agreement to purchase Dr. Welch's practice. Donna Welch asserts that even though the noncompetition agreement was never signed, MEP had agreed to purchase Dr. Welch's practice. Brian Welch, Donna and Dr. Welch's son, testified that his father specifically told him that an agreement to purchase his practice existed; Donna's testimony indicates that Dr. Welch told her that MEP had agreed to all Dr. Welch's terms except a proposal that MEP pay Donna's health insurance. After Dr. Welch died, Donna approached MEP and asked MEP to pay her the purchase price she says MEP had agreed to pay for Dr. Welch's practice. MEP refused to pay any money to Donna Welch for Dr. Welch's practice.
Subsequently, Donna sued MEP and the following individual physicians: Dr. Sanders Beckwith, Dr. Tom Mitchell, Dr. Jim Glassner,[1] and Dr. John Swan. In her complaint, she alleged breach of contract, a third-party-beneficiary claim, conversion, unjust enrichment, and conspiracy, and she sought injunctive relief.
On May 30, 2003, MEP and the individual physicians filed a motion for a summary judgment. They made additional filings on June 10, 2003, to supplement their motion for a summary judgment. Donna filed Brian Welch's affidavit on June 4, 2003; the defendants responded with a motion to strike the affidavit, and the trial court granted that motion.
The trial court heard oral argument on the defendants' motion for a summary judgment, at which time Donna voluntarily dismissed the individual defendants and all *Page 841 
of her tort claims. The trial court granted the defendants' motion for a summary judgment and on July 25, 2003, dismissed the breach-of-contract, unjust-enrichment, and third-party-beneficiary claims and the claim seeking injunctive relief. Donna appealed.
 Standard of Review
"The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law." Brewer v. Woodall, 608 So.2d 370, 372 (Ala. 1992). Furthermore, our review is "subject to the caveat that this Court must review the record in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant."Id.
 Issues and Analysis I. Whether the trial court erred by entering a summary judgment for MEP on Donna Welch's breach-of-contract claim.
Donna Welch claims that genuine issues of material fact exist as to the breach-of-contract claim and that, therefore, the trial court erred by entering a summary judgment for MEP on that claim. Specifically, she contends that the trial court erred by excluding her testimony and Brian's testimony regarding the alleged agreement between Dr. Welch and MEP for the purchase of Dr. Welch's optometry practice. Donna asserts that their testimony should not have been excluded because, she says, it falls under Rule 803, Ala.R.Evid., which states:
 "The following are not excluded by the hearsay rule . . .:
 "(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . ."
Donna specifically avers that her testimony and Brian's testimony demonstrate Dr. Welch's intent, plan, or motive to enter into an agreement pursuant to which MEP would purchase Dr. Welch's optometry practice.
The trial court, however, disagreed. It held that because the noncompetition agreement was never executed, the only evidence of an agreement between Dr. Welch and MEP for the purchase of Dr. Welch's optometry practice was the Welches' testimony that Dr. Welch had told them that such an agreement did in fact exist. The court further stated that the testimony was "clearly hearsay" and that it did not fall within any hearsay exceptions. The court determined that any statement made by Dr. Welch to Donna or Brian was "a statement of memory or belief to prove the fact remembered or believed. . . ." The court distinguished this case fromPhoenix Mutual Life Insurance Co. v. Adams, 30 F.3d 554 (4th Cir. 1994), a case Donna relies on in support of her contention that their testimony should not have been excluded. In Adams, the United States Court of Appeals for the Fourth Circuit held that the federal district court had not erred in admitting into evidence statements by the deceased declarant regarding his intention to change the beneficiary on an insurance policy. In the case before us, Donna offers her and Brian's testimony to prove the existence of an agreement between Dr. Welch and MEP pursuant to which MEP agreed to purchase Dr. Welch's optometry practice. The court specifically stated: *Page 842 
 "However, [Donna Welch] seeks to offer the testimony to prove the existence of the oral contract by showing that Dr. Welch believed he had reached an agreement. However, `[a] statement of . . . belief, offered to prove the fact . . . believed, does not satisfy the exception' provided to 803(3). [Charles W. Gamble,] Gamble's Alabama Rules of Evidence § 803(3)(b) [(1995)]. The statements merely reflect Dr. Welch's belief that he had a deal and the statements are offered to prove a fact believed, the contract. As such, the statements are inadmissible hearsay and, without the statements, [Donna] has no admissible evidence of an agreement."
We agree with the trial court's analysis. Donna offered the testimony to prove that a contract existed, not to prove that Dr. Welch intended to enter into a contract with MEP. It is not disputed that Dr. Welch intended to enter into a contract; what is disputed is whether there actually was an agreement between Dr. Welch and MEP to purchase Dr. Welch's optometry practice.
Clearly, the testimony of Donna and Brian Welch is hearsay, because any statement made by Dr. Welch to either of them regarding an agreement Dr. Welch had with MEP would be offered for the truth of the matter asserted — the existence of the agreement. Furthermore, because the testimony consisted of Dr. Welch's statements of belief offered to prove the fact believed, the testimony does not fall within any of the exceptions to the hearsay rule. As the trial court stated: "[T]he statements are inadmissible hearsay and, without the statements, [Donna] has no admissible evidence of an agreement." Because the testimony was inadmissible hearsay and because there was no other evidence to prove the existence of an agreement on the part of MEP to purchase Dr. Welch's practice, the trial court correctly granted MEP's motion for a summary judgment on the breach-of-contract claim.
 II. Whether the trial court erred by entering a summary judgment for MEP on Donna Welch's unjust-enrichment claim.
Donna Welch also seeks the equitable remedy of restitution. She relies on a quasi-contract theory, alleging that MEP abused a confidential relationship to gain ownership and control of Dr. Welch's optometry practice. Donna specifically argues that MEP and Dr. Welch had a confidential relationship, which she says MEP abused by refusing to negotiate for the purchase of Dr. Welch's practice knowing that Dr. Welch's health was failing, knowing that his death was imminent, and knowing that, upon his death, his optometry practice would, by default, go to MEP.
As the circuit court correctly noted in its summary-judgment order, Donna's argument is defective in that Dr. Welch executed three separate written employment contracts with MEP and entered into an oral consulting agreement with MEP after his illness prevented him from continuing to practice on a regular basis. During the negotiations for each of those contracts, Dr. Welch had ample opportunity to propose an arrangement whereby MEP would purchase his practice if he were to become ill or unable to practice for other reasons. However, the only provision in the contracts providing for illness or disability appears in the third employment contract, which states:
 "In the event of illness or injury disabling Employee and preventing Employee from carrying out his duties under this contract, Employer agrees to pay Employee's salary and bonus for a period not to exceed six (6) months, but in no event beyond the date of termination *Page 843 
of this Contract, less the salary including matching withholding contributions and benefits required to be paid by Employer to hire a professionally competent and qualified optometrist as a replacement."
If Dr. Welch had preferred a different arrangement, he was in a position to bargain for what he wanted. Furthermore, when MEP and Dr. Welch entered into the oral consulting agreement, after Dr. Welch had been diagnosed with cancer, he could have proposed, at that point, that they enter into an agreement specifically stating that MEP would purchase his optometry practice. However, he did not do this.
Donna asserts that MEP was unjustly enriched because MEP retained Dr. Welch's practice after he died and did not pay Dr. Welch before he died or his estate after for the practice. The law regarding unjust enrichment is clear. "One is unjustly enriched if his retention of a benefit would be unjust." Jordanv. Mitchell, 705 So.2d 453, 458 (Ala.Civ.App. 1997) (citingRestatement of Restitution: Quasi Contracts and ConstructiveTrusts § 1, Comment c. (1937)). The Jordan court continued:
 "Retention of a benefit is unjust if (1) the donor of the benefit [here, allegedly Dr. Welch] . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit [here, allegedly MEP] . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly
enriched."
705 So.2d at 458. Because the basis of Donna's unjust-enrichment argument is the allegation that MEP abused a confidential relationship, we will address only the second prong discussed inJordan.
This Court has stated that a confidential relationship exists when "confidence is reposed by one party in another, and the trust or confidence is accepted under circumstances which show that it was founded on intimate personal and business relations existing between the parties, which gave the one advantage or superiority over the other." Cannon v. Gilmer, 135 Ala. 302,305, 33 So. 659, 659 (1903). Dr. Welch and MEP had an employer-employee relationship. They had entered into several contracts, including written employment contracts and an oral consulting agreement. Extensive negotiations had occurred between the parties before any of those agreements were reached. Dr. Welch was an intelligent, professional businessperson with experience in contract negotiations. There is no evidence of a confidential relationship between Dr. Welch and MEP, nor can there be any evidence that MEP abused any such relationship.
Also, in addressing the noncompetition agreement, the trial court classified the agreement as follows:
 "The non-compete agreement was a vehicle designed to allow [Dr. Welch's] disability payments to continue. The agreement itself was a sham since it is acknowledged that Dr. Welch was incapable of competing with MEP at that point. The refusal of MEP to enter into a dubious contract, standing alone, cannot rise to the level of an abuse of a relationship, assuming a confidential relationship existed. Jordan v. Mitchell, 705 So.2d 453, 462
(Ala.Civ.App. 1997)."
The trial court appropriately labeled the noncompetition agreement a sham. Because Dr. Welch was in failing health and was unable to compete with MEP, there was no legitimate reason for either party to enter into a noncompetition agreement. *Page 844 
Therefore, the noncompetition agreement cannot serve as the basis for a claim that MEP was unjustly enriched because it abused a confidential relationship.
Furthermore, it is important to note that over the years MEP compensated Dr. Welch significantly for his services. At the outset of the business relationship, MEP purchased nearly all of the furniture, fixtures, and equipment Dr. Welch had used in his solo optometry practice. MEP paid $71,848.63 for those items, which was the agreed upon fair market value of the furniture, fixtures, and equipment. In addition, the first employment contract set Dr. Welch's salary at $178,600 per year, through the duration of the contract, which ended on September 30, 1996. Similarly, the second employment contract provided Dr. Welch with a salary equal to 68 percent of the net profits of the contact lens clinic, plus other specified benefits. The third and final employment contract provided essentially the same terms as the second contract. Clearly, Dr. Welch was adequately and appropriately compensated while he was associated with MEP. As a result, MEP was not unjustly enriched by retaining Dr. Welch's practice after his death. Although the situation surrounding Dr. Welch's death was tragic, Donna Welch presents no evidence on which to base an unjust-enrichment claim.
 Conclusion
The trial court did not err in entering a summary judgment for MEP on Donna Welch's breach-of-contract claim and her unjust-enrichment claim. The judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, SEE, BROWN, and HARWOOD, JJ., concur.
[1] Dr. Glassner died in December 2001.