[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 640 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 641 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 642 
M. Mallory Mantiply sued his ex-wife Mary Elizabeth Mantiply on July 7, 2003, seeking the repayment of amounts he alleges he lent her. On July 28, 2003, and August 19, 2003, Mallory filed notices of lis pendens as to certain real property owned by Mary Elizabeth in order to secure the debt Mallory alleged in his complaint he was owed by Mary Elizabeth. Mary Elizabeth answered the complaint on August 25, 2003, denying that she was indebted to Mallory. Mallory amended his complaint on December 13, 2003, reasserting his claim seeking the repayment of the alleged loans and also asserting a claim of fraud against Mary Elizabeth in the procurement of the alleged loans. Mary Elizabeth answered the amended complaint on January 5, 2004, denying the allegations contained in that complaint and counterclaimed against Mallory alleging conversion of personal property, conversion *Page 643 
of business property, and money had and received, and seeking an accounting.
On March 22, 2004, Mallory amended his complaint a second time alleging, among others, claims for money lent and of unjust enrichment, equitable mortgage, fraud, and promissory fraud and seeking an accounting, or, in the alternative, compensation under a theory of quantum meruit for the value of certain legal services rendered. Mary Elizabeth answered the second amended complaint on April 8, 2004, denying the allegations contained in the complaint, reasserting her counterclaim, and asserting certain affirmative defenses.
On May 26, 2004, Mary Elizabeth moved the trial court for a summary judgment as to all of the claims asserted against her by Mallory. On July 20, 2004, Mary Elizabeth moved the trial court for a summary judgment on the claims asserted by her in the counterclaim and removal of record of the lis pendens notices filed by Mallory. On July 22, 2004, Mallory responded to the first motion for summary judgment filed by Mary Elizabeth. On August 5, 2004, Mallory moved the trial court to strike certain language from Mary Elizabeth's answer to the second amended complaint, her May 26, 2004, motion for a summary judgment, and her affidavit filed in support of that motion.
On August 16, 2004, the trial court, among other things, granted Mallory's motion to strike in part; entered a summary judgment in favor of Mary Elizabeth on each claim asserted against her by Mallory; determined that Mallory had no equitable mortgage in any real property owned by Mary Elizabeth; declared the lis pendens notices filed by Mallory invalid; and placed the claims asserted by Mary Elizabeth in the counterclaim on its administrative docket. The trial court certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. Mallory appeals and Mary Elizabeth cross-appeals from the judgment entered by the trial court, arguing that the trial court erred in granting Mallory's motion to strike.
In reviewing the disposition of a motion for summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co.,531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating an issue of material fact.Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989). This Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc.,564 So.2d 412 (Ala. 1990).
 Facts
The parties, both attorneys, were married in April 1981; they were divorced on April 8, 1998. The trial court awarded custody of the parties' minor daughter to Mary Elizabeth and ordered Mallory, among other things, to pay $1,200 per month in child support. Following the parties' divorce, Mallory left his position as a partner in a prominent Alabama law firm and moved to Virginia in December 1998. Mallory returned to Alabama in December 1999 to attend his daughter's birthday party. Mallory testified that at the time he returned to Alabama he "wanted to put *Page 644 
[his] family back together" and "hoped" to move in with Mary Elizabeth and his daughter. Mary Elizabeth owned a water-front residence in Elberta ("the Neumann Drive property") and a waterfront residence in Montrose; Mary Elizabeth and her daughter lived at various times in both residences. Mallory began living with Mary Elizabeth and his daughter upon his return to Alabama and continued to reside with them until April 2003. Mallory and Mary Elizabeth did not engage in a romantic or sexual relationship after Mallory returned to Alabama.
The circumstances made the basis of this action arise from (1) payments totaling $250,723.98 that Mallory alleges he paid directly to Mary Elizabeth or on Mary Elizabeth's behalf in satisfaction of certain of her obligations, which he says were loans that Mary Elizabeth was obligated to repay, and (2) Mallory's practicing law at Mantiply Associates, Mary Elizabeth's law office.[1] We set out the factual allegations arising out of the alleged loans and practice of law separately.
I. The Alleged Loans to Mary Elizabeth
Mallory paid Mary Elizabeth $60,000 between January 2000 and November 2000. Mary Elizabeth testified in her affidavit that when Mallory returned to Alabama in December 1999 she did not want him to move in with her and the parties' daughter but that he offered to stay in a guest bedroom and to help with the living expenses. Mary Elizabeth testified that she allowed Mallory to move in with her on the condition that he pay what she considered to be his share of the household expenses. She stated that she and Mallory had an oral contract, terminable at will by either party, under the terms of which she provided Mallory with room, board, and incidentals and she charged him as she deemed appropriate.
Mary Elizabeth testified that the payments Mallory made to her during that period were for the living expenses he incurred while he resided with her and that Mallory never referred to the payments made to her as loans she was obligated to repay. She stated that Mallory never wrote the word "loan" on any of the checks he gave her or otherwise presented her with a promissory note or other writing indicating that the payments he made to her were loans. Mary Elizabeth further testified that Mallory related to her on a number of occasions during the 40-month period in which they resided together that he took great pride in paying his share of the expenses.
Mallory disputes Mary Elizabeth's contentions regarding the nature of the payments made to her. Mallory testified that on the evening he arrived back in Alabama Mary Elizabeth invited him to stay at her residence and that he accepted. Mallory testified that he never entered into an agreement with Mary Elizabeth to pay any living expenses. He stated that he inquired of Mary Elizabeth on several occasions as to his status and that she would tell him that he was a "guest." Mallory testified that the $60,000 he paid Mary Elizabeth between January 2000 and November 2000 represented loans and that Mary Elizabeth acknowledged that those payments were loans.
 II. The Neumann Drive Property
On March 12, 2001, Mallory transferred to Mary Elizabeth one-half of his Morgan Keegan brokerage account, an amount equal to $103,996.80, which consisted of stock and cash; assumed the monthly *Page 645 
mortgage payments of $3,993.77 on the Neumann Drive property; and began paying for the insurance and certain utilities for the Neumann Drive property. Mallory contends that his expenditures relating to the Neumann Drive property were loans to Mary Elizabeth that she agreed to repay. He further contends that Mary Elizabeth agreed to secure repayment of those loans, as well as the $60,000 loaned to her between January 2000 and November 2000, with an interest in the Neumann Drive property payable to him should the property ever be sold.
Mary Elizabeth testified that she had wanted to sell the Neumann Drive property but had been unable to do so. She stated that Mallory had not wanted her to sell the Neumann Drive property and that the property was important to him because he wanted their daughter to inherit the property. Therefore, Mary Elizabeth stated that she proposed to Mallory that she would transfer a one-half undivided interest in the Neumann Drive property to him in exchange for his transferring to her one-half of the value of his brokerage account; his assuming the expenses associated with the property, including the mortgage payments of $3,993.77; both parties' agreeing to change the trustee of a trust established for the parties' daughter; and both parties' agreeing to execute irrevocable wills that each included a $500,000 bequest to the other.
Although Mallory transferred $103,996.80 to Mary Elizabeth on March 12, 2001, and assumed the mortgage payments of $3,993.77, as well as other expenses associated with the Neumann Drive property, Mary Elizabeth testified that Mallory did not fully comply with the terms of the agreement and that he eventually repudiated the agreement because he failed to change the trustee on their daughter's trust and failed to execute an irrevocable will in her favor. Mary Elizabeth testified that when Mallory repudiated the agreement she informed him that she was going to keep the $103,996.80 as a contribution toward his living expenses. Additionally, Mary Elizabeth testified that the mortgage payments of $3,993.77 made by Mallory on the Neumann Drive property were also "part of his payment towards expenses."
Mallory testified that Mary Elizabeth wanted to borrow more money from him in March 2001, but that he was unwilling to lend her additional money without an understanding about how he would be repaid for the money that he had already lent her and for any future moneys he might lend her. Mallory testified in his deposition as follows:
 "Q. What were the terms of this agreement you say you made [with Mary Elizabeth] in March 2001?
 "A. At that point in March of 2001, I had paid her a substantial sum of money since my coming back down here, beginning in January of 2000, starting with $25,000. She owed me a fair amount of money. She was in two pieces of property. She needed to sell one or the other, if not both. I think she has them both up for sale right now. But in any event, in March of 2001 she put to me the idea that if I would basically take over the mortgage that she had on the Neumann Drive property, which she told me at that time was a $384,000 balance, and if I would transfer to her half of my Morgan Keegan account and if I would pay the mortgage payments on Neumann Drive, which were $3,993 and some cents per month, that I would receive a half interest in that property — which I didn't want sold. But if it ever sold, my half interest would be paid to me."
Mallory testified that he told Mary Elizabeth that he would accept her offer if she *Page 646 
would cease her attempts to sell the Neumann Drive property. Mallory stated that Mary Elizabeth agreed to take the Neumann Drive property off the market.
When Mary Elizabeth was questioned as to whether she took the Neumann Drive property off the market shortly after Mallory transferred the money from his brokerage account to her, Mary Elizabeth testified that she did not take the Neumann Drive property off the market. However, Mary Elizabeth was confronted with a facsimile — which was signed by her and requested that the Neumann Drive property be taken off the market — that was sent to her real-estate agent two days after Mallory transferred the money from his brokerage account. Mary Elizabeth initially testified that she had never seen the facsimile; she later stated that the facsimile had been drafted by an employee of hers.
Mallory testified that he pressed Mary Elizabeth for a writing memorializing their agreement relating to the Neumann Drive property; however, he stated that he did not sign the written agreement she eventually presented to him because it contained additional terms — the execution of the wills in favor of each other and the changing of the trustee of their daughter's trust — to which he says he had not agreed. Mallory testified that he performed his obligations under the agreement by transferring the money from his brokerage account to Mary Elizabeth; assuming the mortgage and utility payments on the Neumann Drive property; performing maintenance work on the property, including cutting the grass; and exercising forbearance in the collections of the loans he had made to Mary Elizabeth from January 2000 to November 2000. He stated that Mary Elizabeth eventually sold the Neumann Drive property for over $1.2 million and that she has failed to pay him for his interest in the property pursuant to their agreement.
 III. Mallory's Practice of Law at Mantiply Associates
When Mallory returned to Alabama in December 1999, he was unemployed. Mallory worked at Mary Elizabeth's law office of Mantiply Associates during January 2000, because Mary Elizabeth had asked him to help her with some legal tasks. He stated that he did not necessarily want to work with Mary Elizabeth at the time and that he did not ask to be paid. In the meantime, Mary Elizabeth had encouraged attorney John Sharbrough to hire Mallory, which Sharbrough did in February 2000.
Mallory worked for Sharbrough until that relationship ended in October 2001 because of a dispute between Mallory and Sharbrough regarding compensation and an attorney fee on a legal matter. When Mallory left Sharbrough's employment he took a number of case files with him, which, according to Sharbrough, Mallory was not authorized to do.
Mallory began practicing law at Mantiply Associates in November 2001. Mary Elizabeth's practice had a net loss of approximately $30,719 from January 2000 through November 2001. However, from the time Mallory began practicing law at Mantiply Associates in November 2001 until he stopped working at Mantiply Associates in April 2003, the practice had a net income of approximately $164,544. Mallory alleges that despite turning Mary Elizabeth's law practice into a profitable one, he was paid only $10,300 by Mary Elizabeth during the period he worked at Mantiply Associates.
 A. The Employment Arrangement
Mary Elizabeth testified that she did not want Mallory practicing law with her at Mantiply Associates. However, she said that because Mallory had no place else to work she allowed him to work at Mantiply Associates as an employee at will. Mary Elizabeth stated that she made it *Page 647 
clear to Mallory that he was an employee at will, that he did not have any interest in Mantiply Associates, and that he did not have the authority to write checks on behalf of Mantiply Associates. She testified that she told Mallory that if he chose to work at Mantiply Associates she would be in charge of the firm's money and that she would pay him what she "thought was fair." Mary Elizabeth testified that Mallory agreed to those terms.
Mallory testified that Mary Elizabeth's law practice at Mantiply Associates was "dead" when he started practicing law there in November 2001. As mentioned above, Mallory presented evidence indicating that the practice had lost approximately $30,719 from January 2000 through November 2001. Mallory testified that he did not want to practice law with Mary Elizabeth because "she does not practice" and that during the time he worked at Mantiply Associates he was the "only one practicing law."
Mallory testified that Mary Elizabeth wanted him to come to work at Mantiply Associates and that she told him certain things that induced him to forgo looking for other employment and to work at Mantiply Associates. Mallory stated that Mary Elizabeth told him she had $100,000 to use to finance the law practice and that she had some matters pending, including several cases that had the potential to generate substantial fees. Mallory testified in his deposition as follows:
 "She told me to come on up there and work. She told me she had $100,000 in the bank. She told me she had things going on. She told me we could make it. She told me to bring the cases up there and we would go from there. I heard those things. I went up there, I sat down, I went to work."
Mallory stated that he and Mary Elizabeth did not have a partnership agreement and that they had no written agreement as to compensation. He described the agreement they did have as follows:
 "Q. And what I am asking you for is to tell me what you understood your agreement was in connection with you going to work at [Mantiply Associates] in November 2001.
 "A. Well, the agreement was that I would come up there and sit down and go to work for the clients and for clients to come and that the money would be run through her business and that I would be treated basically fairly."
Mallory stated that he did not have the authority to sign checks for Mantiply Associates and that he had no control over what was being paid out by Mantiply Associates. He stated that the only control he had was "what was coming into [the law firm] based on how hard [he] was working and the checks [he] was paying into it." Mallory testified that he considered himself self-employed while he worked at Mantiply Associates.
 B. The Bank Accounts
Mary Elizabeth had maintained an operating account at Compass Bank for her law practice in the name of "Mantiply 
Associates" since 1991. Mary Elizabeth contends that on March 25, 2003, while employed at Mantiply Associates, Mallory covertly opened a bank account at AmSouth Bank, also in the name of "Mantiply Associates." Mallory's name was the only name on that account. Mary Elizabeth testified that immediately before and after leaving his employment at Mantiply Associates, Mallory surreptitiously deposited checks made payable to Mantiply Associates in the account bearing the same name at AmSouth Bank. She stated that Mallory was not authorized to open an account in the name of "Mantiply Associates." *Page 648 
On April 1, 2003, Mallory entered the offices of Mantiply 
Associates and took files that Mary Elizabeth testified belonged to Mantiply Associates. Mallory established his own law practice representing the clients whose files Mary Elizabeth stated he had taken from her office without authorization. Mary Elizabeth contends that she requested Mallory give her an accounting of the fees that he had recovered from representing those clients and that he reimburse Mantiply Associates for the costs it had incurred in representing those clients before Mallory took the files, but that Mallory has refused to do so.
Mallory testified that Mary Elizabeth informed him in March 2003 that she was getting out of the practice of law and that he should "buy her out." Mallory stated that he and Mary Elizabeth began discussing how "to wind things up between us." Additionally, Mallory testified that on March 20, 2003, Mary Elizabeth had refused to pay his secretary with money he had provided her for that purpose and that he was faced with having to pay that overhead expense twice. Mallory stated that at that point he opened the bank account at AmSouth Bank in the name of "Mantiply Associates." He thought at the time that he would be continuing to practice law at the same location using the same telephone numbers and advertising and that Mary Elizabeth would no longer be practicing law.
Mallory testified that on April 1, 2003, he delivered a handwritten letter to Mary Elizabeth offering to have a third party settle the issues between them. He stated that he telephoned Mary Elizabeth later that day to see if she was interested in settling the issues between them and that she told him in that conversation to take his files and "get out" of the office by noon or she was going to change the locks. Mallory stated that he took his files and left the premises. He further testified that he purchased equipment and rented office space and continued to practice law. Mallory stated that he contacted AmSouth Bank and had the name changed on his account from "Mantiply Associates" to "M. Mallory Mantiply." Mallory testified that he deposited settlement proceeds into the AmSouth Bank account from cases that he handled on behalf of his clients.
 C. Diverted Clients 1. The Fee Agreements
Mary Elizabeth testified that during the course of her law practice she had her clients enter into a fee agreement that specifically identified "Mantiply Associates" as the attorney employed to represent the client. She stated that Mallory was expected to use this fee agreement while he was working at Mantiply Associates. However, on a number of occasions Mallory used a fee agreement he had generated, which identified "M. Mallory Mantiply" as the attorney being employed by the client pursuant to the agreement. Mary Elizabeth testified that Mallory did not request permission nor was he authorized to contract with a client using a fee agreement that identified him, rather than Mantiply Associates, as the attorney being employed.
Mallory testified that when he went to work for Mantiply 
Associates, Mary Elizabeth did not have a fee agreement. He stated that he generated a fee agreement for both "Mantiply 
Associates" and "M. Mallory Mantiply" and that he would use "whichever [fee agreement] came up first." Nevertheless, Mallory testified that regardless of which fee agreement he used he would turn over to Mary Elizabeth the proceeds generated from the work he did on the clients' behalf. *Page 649 
 2. The Telephone Book Advertisement
Mallory had approached Mary Elizabeth in July 2002 about purchasing an advertisement in the "Best Talk" telephone book. Mary Elizabeth agreed to purchase an advertisement, and Mallory began putting an advertisement together for Mantiply 
Associates. The advertisement that appeared in the Best Talk telephone book contained pictures of Mary Elizabeth and Mallory above the name "Mantiply Associates." Mary Elizabeth, on behalf of Mantiply Associates, entered into the advertising contract with the company that publishes the book. The cost of the advertisement was $7,344, payable in four installments. Mary Elizabeth testified that she paid the first three installments of the contract; however, she contends that Mallory contacted the company that publishes the telephone book, made the fourth installment payment, and then arranged to have the telephone number referenced in the Best Talk telephone book redirected from Mantiply Associates to his new law office.
Mallory testified that after he left Mantiply Associates he contacted the publisher of the Best Talk telephone book, who informed him that the bill for the advertisement and telephone-number listing was outstanding. He stated that he was told if he paid the bill he could have the telephone-number listing. Mallory testified that he paid the outstanding bill and had the telephone number in the Best Talk telephone book redirected. He stated that he thought this was fair because the advertisement was his idea; his name and picture were on the advertisement; and Mary Elizabeth still had her original telephone number, which appeared in an advertisement in the Real Yellow Pages telephone book.
 Analysis I. Claims Arising Out of the Alleged Loans A. Moneys Owed
Mallory argues that the trial court erred in entering a summary judgment in favor of Mary Elizabeth on his claim alleging that Mary Elizabeth owed him $250,-723.98[2] and that she has failed to repay him. This Court has stated:
 "A plaintiff establishes a prima facie case in an action for money due on [an] open account by presenting evidence that money was delivered to the defendant, that it was a loan, and that it has not been repaid. 58 C.J.S. Money Lent § 7 (1948). `Ordinarily, an unexplained payment of money will be presumed to be made in payment of debt, or as a loan, rather than as a gift.' Bowline v. Cox, 248 Ala. 55, 26 So.2d 574 (1946). This presumption arises in relationships between parties in which the payor naturally places confidence in the payee that the money will be repaid. Furthermore, we recognize the general rule that if no time is stipulated, a loan is `presently payable.' Lindsey v. Hamlet, 235 Ala. 335, 179 So. 234
(1938)."
Livingston v. Tapscott, 585 So.2d 839, 841 (Ala. 1991).
Mary Elizabeth argues that Mallory's affidavit presented in opposition to her summary-judgment motion contradicts his earlier sworn deposition testimony, in which she says Mallory admitted that the money he paid her was "going toward his obligation to pay expenses" and, therefore, was ineffective in creating a genuine issue *Page 650 
of fact as to whether the money Mallory paid her was a loan. This argument is without merit.
This Court has stated:
 "`[A] party is not allowed to directly contradict prior sworn testimony to avoid the entry of a summary judgment.' Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 317 (Ala. 1992), citing Doe v. Swift, 570 So.2d 1209, 1214 (Ala. 1990). `"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." `Id., quoting Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961 (Ala. 1987). However, when a party submits a subsequent affidavit merely to clarify his or her answers to ambiguous questions asked by counsel during a deposition or other prior sworn proceeding or to supply information not necessarily sought by questions asked at the deposition or other prior sworn proceeding, the trial court should consider the subsequent affidavit. See, e.g., Rickard v. Shoals Distrib., Inc., 645 So.2d 1378, 1382-83
(Ala. 1994); and Tittle v. Alabama Power Co., 570 So.2d 601, 606-07 (Ala. 1990)."
Wilson v. Teng, 786 So.2d 485, 497 (Ala. 2000).
Mary Elizabeth relies on the following deposition testimony by Mallory to support her contention that Mallory admitted that the payments he made to her were for expenses and that they were not loans:
 "Q. And you never said that you were paying your share of the expenses? You never said that or anything like that?
 "A [Mallory]. I have said that I feel like I have paid my share of the expenses.
 "Q. You're talking about — when you say you feel like you have paid your share of the expenses, you're talking about the money that you contend is loan?
 "A. I'm talking about — yeah, yeah, it's kind of mixed up together.
 ". . . .
 "Q. Well, my question is: Do you owe her anything for expenses or were you just a guest living there for free for 40 months or longer?
 "A. I don't know about your number on the months. I'm uncomfortable with the idea of the guest status. I believe in paying my way.
 "Q. And were you paying your way?
 "A. Yes, sir.
 "Q. All right. And it wasn't a loan, you were paying your way, weren't you?
 "A. It was all bottled up together."
Mary Elizabeth relies on the above-quoted excerpts from Mallory's deposition testimony to argue that he admitted that the moneys he paid to her were for living expenses and that, therefore, his subsequent affidavit testimony, in which he states that the moneys paid to her were loans, is contradictory and cannot be considered for summary-judgment purposes. We initially note that Mary Elizabeth does not delineate that portion of Mallory's affidavit that supposedly contradicts the above-quoted deposition testimony. Further, Mary Elizabeth's argument is premised on her assertion that Mallory admitted in his deposition testimony that the moneys paid to her were for expenses and were not loans. However, a reading of Mallory's deposition excerpts in their entirety indicates that he consistently testified throughout his deposition that the *Page 651 
moneys he paid to Mary Elizabeth were loans that she was obligated to repay. The above-quoted excerpts relied on by Mary Elizabeth are taken out of context; when they are read in conjunction with the remainder of Mallory's deposition testimony they are entirely consistent with the overall theme of Mallory's testimony. Mallory never denied in his deposition having incurred some expenses while he resided with Mary Elizabeth, stating that he was "sure [he] did." Rather, Mallory testified that the payment of any expenses that he may have incurred should be in the nature of a set-off against the moneys he loaned Mary Elizabeth and the moneys he claims an interest in from the sale of the Neumann Drive property.[3] At no time during Mallory's deposition did he waiver from his contention that the moneys paid to Mary Elizabeth were loans that she was obligated to repay; therefore, no contradiction exists between Mallory's deposition testimony and his subsequent affidavit testimony.
Relying upon Bowline v. Cox, 248 Ala. 55, 26 So.2d 574
(1946), Mary Elizabeth next argues that she is entitled to a presumption that when payments are made by a debtor, those payments are made in payment of a debt and that Mallory has made no showing rebutting this presumption. This Court stated inBowline:
 "`It is a correct doctrine to say that payments of money made by a debtor to an existing creditor, or made by one who is under obligation to pay to the receiver thereof, . . . will be deemed presumptively to apply as credits upon the obligation, and not as gratuities or gifts.'"
Bowline, 248 Ala. at 57, 26 So.2d at 577 (quoting 71 A.L.R. 1018).
Mary Elizabeth's argument fails because it presumes that Mallory was a debtor. Viewing the record in a light most favorable to Mallory, as we are required to do, we conclude that a question of fact exists as to the nature of the moneys paid by Mallory to Mary Elizabeth and, therefore, a question of fact necessarily exists as to the nature of the relationship between Mallory and Mary Elizabeth that prevents Mary Elizabeth from presuming that Mallory was a debtor. Mallory presented copies of checks and account transfers indicating that he paid to, or on Mary Elizabeth's behalf,[4] moneys he alleges to be loans to Mary Elizabeth. Mallory testified that the moneys paid to, or on Mary Elizabeth's behalf, were loans that she was obligated to repay and that she acknowledged that the moneys paid to her were loans. Finally, Mallory testified that Mary Elizabeth has failed to repay those loans. Accordingly, we conclude that Mallory has presented a prima facie case of money owed; therefore, we must reverse the summary judgment as to this issue.
 B. Equitable Mortgage
Mallory next argues that he is entitled to an equitable mortgage on the Neumann Drive property. He contends that in March 2001, Mary Elizabeth, in addition to the $60,000 that she had already borrowed from him, wanted to borrow additional money from him, but that he was unwilling to lend her any additional money without an agreement as to how the moneys that *Page 652 
he had already lent her and any additional moneys that he may lend her in the future would be repaid. Mallory states that he and Mary Elizabeth entered into an oral agreement in March 2001, pursuant to which he would transfer one-half of his brokerage account to her and assume the mortgage payments, insurance payments, and utility payments on the Neumann Drive property in exchange for Mary Elizabeth's taking the Neumann Drive property off of the market and transferring to Mallory a half interest in the property as security for the payment to her from his brokerage account, his assuming the mortgage payments and other expenses associated with the property, and the $60,000 he had paid her between January 2000 and November 2000. Mallory states that the agreement provided that he would be paid for his one-half interest in the Neumann Drive property should it ever be sold. Mallory transferred $103,996.80 to Mary Elizabeth, which represented half of the value of his brokerage account, and assumed the mortgage payments, insurance payments, and utility payments on the Neumann Drive property. He contends that the Neumann Drive property was subsequently sold and that he was not paid for his interest in the property from the sale proceeds.
Mary Elizabeth argues that Mallory's equitable-mortgage claim fails because, she argues, it violates the Statute of Frauds. We agree. The Statute of Frauds provides, in pertinent part:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
 ". . . .
 "(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller. . . ."
§ 8-9-2, Ala. Code 1975. An action seeking to declare an equitable mortgage on property in satisfaction of a debt secured by that property is subject to a Statute of Frauds defense.Edwards v. Scruggs, 155 Ala. 568, 46 So. 850 (1908). See also Davis v. Harris, 211 Ala. 679, 101 So. 458 (1924) (holding that to avoid the Statute of Frauds an equitable mortgage must be evidenced by a writing). A statutory exception to the writing requirement exists where the purchaser pays the purchase money, or a portion thereof, and the purchaser is put in possession of the land by the seller. § 8-9-2(5), Ala. Code 1975; and Keller v. Security Fed. Sav. Loan Ass'n,555 So.2d 151 (Ala. 1989). In order to satisfy the requirements of the part-performance exception, the possession must be exclusively referable to the contract in issue.Keller, supra. Additionally, this Court has stated the following regarding the possession necessary to satisfy the partial-performance exception:
 "`[T]he possession must be referable to the promise and not to some domestic relationship of the vendor and vendee. . . .'
 "`. . . .
 "`. . . "If the possession . . . could be accounted for just as well by some other right or title actually existing in the vendee's favor, or by some relation between him and the vendor other than the alleged oral contract, it is not such a possession as the doctrine requires."'" *Page 653 
Smith v. Smith, 466 So.2d 922, 925 (Ala. 1985) (quotingJones v. Jones, 219 Ala. 62, 64,121 So. 78, 78-79 (1929)).
It is undisputed that the parties' agreement regarding the Neumann Drive property was never reduced to writing. Further, although Mallory had paid the purchase price for his interest in the property, any claim of possession that he had in the property stemmed from the already existing living arrangement he had with Mary Elizabeth and was not exclusively referable to the parties' March 2001 agreement regarding the Neumann Drive property. Therefore, because any claim of possession that Mallory had in the Neumann Drive property was not exclusively referable to the March 2001 agreement, he has not satisfied the partial-performance exception to the writing requirement. Accordingly, Mallory's equitable-mortgage claim fails because it violates the Statute of Frauds, and we affirm the summary judgment as to this issue.
 C. Fraud in the Inducement
Mallory next argues that Mary Elizabeth made certain representations to him that induced him into making the loans alleged in this case. Mallory's entire "argument" as to this issue consists of approximately one-half page in his brief to this Court, contains no discussion regarding the representations that allegedly induced him to act, and cites no authority. Rule 28(a)(10), Ala. R.App. P., provides that the appellant's brief shall contain "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." It is well settled that "`[w]here an appellant fails to cite any authority for an argument, this Court may affirm the judgment as to those issues, for it is neither this Court's duty nor its function to perform all the legal research for an appellant.'"Spradlin v. Birmingham Airport Auth., 613 So.2d 347,348 (Ala. 1993) (quoting Sea Calm Shipping Co., S.A v.Cooks, 565 So.2d 212, 216 (Ala. 1990)). Because Mallory presents virtually no argument and absolutely no authority in support of this issue, we affirm the judgment of the trial court as to this issue.
 D. Promissory Fraud
Mallory next asserts a promissory-fraud claim against Mary Elizabeth, alleging that she had no intention of repaying the moneys he lent her at the time she promised to do so. This Court has stated:
 "`The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.'"
Waddell Reed, Inc. v. United Investors Life Ins.Co., 875 So.2d 1143, 1160 (Ala. 2003) (quoting Padgettv. Hughes, 535 So.2d 140, 142 (Ala. 1988)). Further,
 "`[w]hile the mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent, for purposes of a promissory-fraud claim, "the factfinder may consider that failure, together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive."'" *Page 654 
Byrd v. Lamar, 846 So.2d 334, 343 (Ala. 2002) (quotingEx parte Grand Manor, Inc., 778 So.2d 173, 182
(Ala. 2000)).
Mallory contends that he initially paid Mary Elizabeth $60,000 between January 2000 and November 2000 and that she promised to repay that money. However, the parties reached a new agreement regarding the $60,000 in March 2001, when the parties entered into the agreement involving the Neumann Drive property. According to Mallory, Mary Elizabeth agreed to transfer a half interest in the Neumann Drive property to him as security for the initial loans totaling $60,000,[5] for the transfer of $103,996.80 from his brokerage account, and for his assuming the mortgage payments, as well as other expenses, associated with the Neumann Drive property. Mallory testified that under this agreement he would be paid for his interest in the property should the property ever be sold. The property was subsequently sold, and Mallory was not paid for his interest in the property. Mallory alleges that when she entered into the agreement regarding the Neumann Drive property in March 2001, Mary Elizabeth did not intend to pay him for his interest in the Neumann Drive property should it be sold.
Mallory's promissory-fraud claim is based on Mary Elizabeth's alleged oral promise that she would transfer a half interest in the Neumann Drive property to Mallory as security for the moneys advanced to her and that she would pay him for his interest in the property should it ever be sold. "[A]n oral promise that is void by operation of the Statute of Frauds will not support an action against the promisor for promissory fraud." Brucev. Cole, 854 So.2d 47, 58 (Ala. 2003). Because the parties' agreement regarding the Neumann Drive property violates the Statute of Frauds, that agreement will not support Mallory's promissory-fraud claim. Accordingly, the trial court did not err in entering a summary judgment in favor of Mary Elizabeth on this claim.
 E. Unjust Enrichment
Mallory next contends that the trial court erred in entering a summary judgment in favor of Mary Elizabeth on his unjust-enrichment claim. In order for a plaintiff to prevail on a claim of unjust enrichment, the plaintiff must show that
 "the `"defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud."' Dickinson v. Cosmos Broad. Co., 782 So.2d 260, 266 (Ala. 2000) (quoting Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So.2d 1385, 1387 (Ala. 1986)). . . . `The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.' Battles v. Atchison, 545 So.2d 814, 815 (Ala.Civ.App. 1989)."
Avis Rent A Car Sys., Inc. v. Heilman 876 So.2d 1111,1123 (Ala. 2003). "`One is unjustly enriched if his retention of a benefit would be unjust.'" Welch v. Montgomery EyePhysicians, P.C., 891 So.2d 837, 843 (Ala. 2004) (quotingJordan v. Mitchell, 705 So.2d 453, 458
(Ala.Civ.App. 1997)). The retention of a benefit is unjust if
 "`(1) the donor of the benefit . . . acted under a mistake of fact or in misreliance *Page 655 
on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.'"
Welch, 891 So.2d at 843 (quoting Jordan,705 So.2d at 458). The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case. Heilman, supra.
Mallory alleged in his second amended complaint that he lent the moneys in question to Mary Elizabeth pursuant to an agreement with her pursuant to which she would repay the moneys and that to allow Mary Elizabeth to retain the moneys paid to her would result in her being unjustly enriched.
Mary Elizabeth's basis for retaining the large sums of money advanced to her by Mallory is a purported oral agreement under which she would provide Mallory with room, board, and incidentals and charge him for those expenses as she deemed appropriate. Regarding the Neumann Drive property, Mary Elizabeth contends that she had wanted to sell the property but had been unable to do so and that Mallory wanted to keep the property in the family for the benefit of the parties' daughter. Mary Elizabeth, therefore, proposed to Mallory that she would transfer a one-half interest in the property to him in exchange for his transferring to her one-half of the value of his brokerage account; his assuming the expenses associated with the property, including the monthly mortgage payments of $3,993.77; both parties' agreeing to change the trustee of a trust that had been established for their daughter; and both parties' agreeing to execute irrevocable wills each containing a $500,000 bequest to the other. Mallory transferred to Mary Elizabeth $103,996.80 representing one-half of his brokerage account and assumed the monthly mortgage payments as well as other expenses associated with the Neumann Drive property. Mary Elizabeth eventually sold the Neumann Drive property for $1.2 million and has paid Mallory nothing from the sale proceeds.
Mary Elizabeth contends that Mallory repudiated the agreement because he failed to change the trustee on the trust established for their daughter and failed to execute the will in her favor. She, therefore, unilaterally informed him that she was going to keep the $103,996.80 as a contribution toward his living expenses and was recharacterizing the monthly mortgage payments of $3,993.77 as a payment toward his living expenses. Mallory insists that the agreement regarding the Neumann Drive property did not include changing the trustee of the daughter's trust or executing wills in favor of each other.
We conclude from the evidence presented that a genuine issue of material fact exists as to whether Mallory fully performed under the agreement he and Mary Elizabeth had reached concerning the Neumann Drive property, i.e., that the property would not be sold, but rather kept in the family, and whether Mary Elizabeth, in violation of the agreement, sold the property for $1.2 million, and rather than pay Mallory as agreed, retained the substantial sum of money redesignating it as living expenses under the guise of an oral agreement that she could charge Mallory as she deemed appropriate for his room and board. Such conduct on the part of Mary Elizabeth would rise to the level of unconscionable conduct as that term is discussed in Welch,supra, and Jordan, supra. Accordingly, we reverse *Page 656 
the summary judgment entered by the trial court on Mallory's unjust-enrichment claim.
 II. Claims Arising Out of Mallory's Practicing Law at Mantiply Associates A Quantum Meruit
Mallory alleges that he was paid only $10,300 by Mary Elizabeth during the 17 months he practiced law at Mantiply 
Associates. He contends that Mary Elizabeth failed to compensate him for the reasonable value of his work and he requested an accounting or, in the alternative, a judgment under a quantum meruit theory for the value of the work he performed.[6]
Recovery on a theory of quantum meruit arises when a contract is implied. Brannan Guy, P.C. v. City ofMontgomery, 828 So.2d 914 (Ala. 2002).
 "There are two kinds of implied contracts — those implied in fact and those implied in law. Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise [to pay for the labor or services of another] to prevent a manifest injustice or unjust enrichment, etc."
Green v. Hospital Bldg. Auth. of Bessemer, 294 Ala. 467,470, 318 So.2d 701, 704 (1975). This Court has stated:
 "It is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and the result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered."
Hendrix, Mohr Yardley, Inc. v. City of Daphne,359 So.2d 792, 795 (Ala. 1978). In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation of compensation for its services.Utah Foam Prods., Inc. v. Polytec, Inc., 584 So.2d 1345
(Ala. 1991). However, "[w]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." Brannan Guy,828 So.2d at 921. The existence of an express contract on a given subject generally excludes an implied agreement on the same subject.Vardaman v. Florence City Bd. of Educ., 544 So.2d 962
(Ala. 1989).
The parties' agreement that Mallory would come to work at Mantiply Associates, that Mary Elizabeth would continue to control the firm's money, and that Mallory would be "treated fairly" is so vague as to be tantamount to no agreement at all. The "agreement" contains no identifiable and enforceable measure of a term essential to the agreement — Mallory's compensation. We note that no contract, whether express or implied-in-fact, is formed "without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract." Steiger v. Huntsville City Bd. of Educ,653 So.2d 975, 978 (Ala. 1995). Because no express contract or contract implied-in-fact exists between the parties, in order for Mallory to prevail on his claim based on quantum meruit he must establish that Mary Elizabeth knowingly accepted his services and that he had a reasonable expectation of being compensated for his services. *Page 657 
The evidence viewed in a light most favorable to Mallory indicates that Mary Elizabeth asked Mallory in November 2001 to come to work at Mantiply Associates. Mallory worked long hours while he was working at Mantiply Associates; Mary Elizabeth rarely came to the office. Mary Elizabeth's practice had sustained a net loss of approximately $30,719 from January 2000 through November 2001. During the 17 months Mallory practiced law at Mantiply Associates the practice showed a net profit of approximately $164,544. However, despite turning the practice to profitability, Mallory was paid only $10,300 by Mary Elizabeth during the 17 months he practiced at Mantiply Associates. There is a factual question as to whether Mary Elizabeth knowingly accepted the benefit of Mallory's services and whether Mallory had an expectation of being compensated for the reasonable value of his services. Accordingly, we conclude that Mallory has established a prima facie case as to his claim based on quantum meruit.
However, Mary Elizabeth argues that Mallory's claim seeking recovery under a theory of quantum meruit and arising out of his practice of law at Mantiply Associates must fail because, she says, he has violated the "clean hands doctrine." This Court has stated:
 "`This Court has recognized that one "who seek[s] equity must do equity" and "one that comes into equity must come with clean hands." The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights "contrary to equity and good conscience."'"
Neal v. Neal, 856 So.2d 766, 786 (Ala. 2002) (quotingJ M Bail Bonding Co. v. Hayes, 748 So.2d 198, 199
(Ala. 1999)).
Mary Elizabeth argues that Mallory violated the "clean hands doctrine" by covertly opening a bank account at AmSouth Bank in the name of "Mantiply Associates" and by depositing into that account checks made payable to Mantiply Associates. She also contends that Mallory violated the clean hands doctrine by diverting clients from Mantiply Associates by the use of the fee agreements executed in his name rather than in the name of Mantiply Associates, by redirecting the Best Talk telephone number to the telephone at his new law office, and by taking files belonging to Mantiply Associates when he left Mantiply Associates.
A detailed statement of the evidence bearing on these issues is set out above and need not be repeated. The evidence viewed in a light most favorable to Mallory indicates that questions of fact exist as to whether Mallory violated the clean hands doctrine so as to preclude his quantum meruit recovery. Accordingly, we conclude that the trial court erred in entering a summary judgment in favor of Mary Elizabeth on Mallory's claim, based on a theory of quantum meruit, arising out of the practice of law at Mantiply Associates. We therefore reverse the summary judgment as to that claim.
 B. Fraud in the Inducement
Mallory next argues that Mary Elizabeth made certain fraudulent representations to him that induced him to practice law at Mantiply Associates. Mallory's "argument" in support of this claim consists of one page and cites no authority. Mallory has again failed to comply with the minimum requirements of Rule 28, Ala. R.App. P.; therefore, we affirm the judgment of the trial court as to this issue. Spradlin, supra.
Even assuming, however, that Mallory had satisfied the requirements of Rule 28 as to this claim, his claim would *Page 658 
still fail. Mallory could not have reasonably relied on the representations allegedly made by Mary Elizabeth. An essential element of any fraud claim is "reasonable reliance." SeeReynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala. 2002). Mallory contends that Mary Elizabeth made representations concerning the nature and profitability of her various business ventures and her financial ability to fund a law practice. However, these representations were made by Mary Elizabeth to Mallory after Mary Elizabeth had borrowed approximately $164,000 from Mallory and Mallory had assumed the mortgage on the Neumann Drive property. Additionally, Mallory testified that Mary Elizabeth was going to have to "pawn" her automobile if he did not lend her money on one occasion; that Mary Elizabeth's living expenses were exorbitant; and that her law practice was "dead" when he started working at Mantiply Associates. Accordingly, we conclude that Mallory could not have reasonably relied on any representations as to Mary Elizabeth's ability to finance a law practice.
 Cross-Appeal
Mary Elizabeth argues in her cross-appeal that the trial court erred in striking certain matters from her counter-claim complaint, summary-judgment narrative, and affidavit. Specifically, Mary Elizabeth contends that the matters stricken by the trial court were relevant and necessary to her defense of the claims asserted by Mallory. However, Mary Elizabeth has cited no authority in support of this contention. She cites only Rule 12(f), Ala. R. Civ. P., which provides:
 "Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within thirty (30) days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."
Mary Elizabeth does not argue in her brief in support of her cross-appeal that Mallory's motion to strike was untimely. Further, Rule 12(f) relates only to motions to strike materials from pleadings and not to materials filed in support of a motion for a summary judgment, e.g., affidavits, briefs, exhibits, etc. Accordingly, because Mary Elizabeth has failed to cite any relevant authority in support of her contention, we affirm the trial court's order striking portions of Mary Elizabeth's counterclaim, summary-judgment narrative, and affidavit.Spradlin, supra.
 Conclusion
We reverse the trial court's judgment as it pertains to Mallory's claims asserting money owed and unjust enrichment and seeking recovery under a theory of quantum meruit arising out of his practice of law at Mantiply Associates. We affirm the trial court's judgment as it pertains to Mallory's fraud claims and his claim asserting an equitable mortgage. As to Mary Elizabeth's cross-appeal, we affirm the trial court's order granting Mallory's motion to strike.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, LYONS, HARWOOD, WOODALL, STUART, SMITH, and PARKER, JJ., concur.
[1] Mantiply Associates is the trade name under which Mary Elizabeth has practiced law since 1986. 
[2] This amount includes the $60,000 Mallory allegedly loaned to Mary Elizabeth; the transfer of $103,996.80 from Mallory's brokerage account; and the monthly payments of $3,993.77 Mallory says he made after he assumed the mortgage on the Neumann Drive property.
[3] Mary Elizabeth raised set-off as an affirmative defense; therefore, she has the burden of proving that defense. Exparte Fort James Operating Co., 895 So.2d 294 (Ala. 2004). However, Mary Elizabeth failed to develop this set-off defense in her motion for a summary judgment, and she does not argue it on appeal.
[4] For example, he presented copies of checks indicating that Mallory paid the $3,993.77 monthly mortgage payment on the Neumann Drive property directly to the mortgage company.
[5] Because the initial loans of $60,000 were made a part of the agreement regarding the Neumann Drive property reached between the parties in March 2001, we consider any promise by Mary Elizabeth to repay those loans as arising from the March 2001 transaction and not from earlier transactions occurring between January 2000 and November 2000.
[6] It is undisputed that no partnership agreement existed between the parties. The business relationship that existed between the parties is more akin to an employer-employee relationship or a contractor-independent contractor relationship. Therefore, we will not analyze this claim as one seeking an accounting, but rather as one seeking the value of the legal work performed by Mallory while he worked at Mantiply Associates under a theory of quantum meruit. *Page 659