BRYAN, Judge.
The plaintiffs below, Richard Presley and Joy Presley, appeal from a judgment as a matter of law (“JML”) entered in favor of the defendants below, B.I.C. Construction, Inc. (“B.I.C.”), Brandon Grant, and Michael Roberts. We affirm.
In May 2007, the Presleys were building a new house (“the house”) for themselves; Richard Presley was acting as the general contractor. The Presleys negotiated with B.I.C., a corporation operated by Grant and Roberts, regarding the framing of the house, the building of a deck frame and front steps for the house, and the installation of the doors and the windows in the house. During the negotiations, B.I.C. told the Presleys that it would provide, at cost, the materials for the framing of the house, the materials for the building of the deck frame and front steps, and the doors and windows to be installed in the house. B.I.C. also told the Presleys that it would charge a fee for the labor to perform the framing of the house, the building of the deck frame and front steps, and the installation of the doors and windows. Furthermore, B.I.C. told the Presleys that it would provide them with copies of the invoices it received from its suppliers for the materials it used in performing its work.
B.I.C. recommended that the Presleys select Silver Line Anderson windows (“Silver windows”) because they were the best available vinyl windows. On May 21, 2007, B.I.C. obtained a quote from Birmingham Sash & Door (“Birmingham Sash”), the supplier that B.I.C. normally used for doors and windows, for particular doors and Silver windows to install in the house. Birmingham Sash quoted a total price of $4,459.19 for the doors and Silver windows. The Presleys selected the Silver windows and, on May 26, 2007, entered into a written contract (“the May 26 contract”) with B.I.C.
In the May 26 contract B.I.C. agreed to frame the house, to build the deck frame and front steps, and to install the doors and windows in a workmanlike manner. The Presleys agreed to pay B.I.C. a fee in the amount $9,540 for its labor in performing its work under the May 26 contract and to pay B.I.C. the cost of the materials used in framing the house, the materials used in building the deck frame and front steps, and the doors and windows up to stated maximum amounts. The May 26 contract specified a maximum cost that the Presleys would pay for the materials to frame the house of $14,602.82, a maximum *614 cost that the Presleys would pay for the materials to build the deck frame and front steps of $1,786.98, and a maximum cost that the Presleys would pay for the doors and windows of $4,459.19. Soon after executing the May 26 contract, the parties orally agreed that B.I.C. would provide the labor to pour the concrete slab of the house for $2,160; apparently, this oral agreement was never reduced to writing.
On May 29, 2007, three days after the parties entered into the May 26 contract, the Presleys gave B.I.C. a check in the amount of $4,459.19 for the doors and windows that were to be installed in the house. After receiving the Presleys’ check in the amount of $4,459.19, B.I.C. placed an order with Birmingham Sash for the doors and Silver windows the Presleys had selected. When B.I.C. placed the order with Birmingham Sash, a dispute existed between B.I.C. and Birmingham Sash regarding B.I.C.’s account; Birmingham Sash insisted that B.I.C. owed Birmingham Sash a balance on its account whereas B.I.C. insisted that its account was current. Despite the existence of this dispute, B.I.C. understood that Birmingham Sash would order the doors and Silver windows for the Presleys’ house.
On May 30, 2007, the Presleys gave B.I.C. a check in the amount of $7,400, which constituted a partial payment for the materials to be used in framing the house. B.I.C. ordered the materials to be used in framing the house and building the deck frame and front steps from Brown Lumber & Building Supply, Inc. (“Brown Lumber”). The cost of those materials totaled $11,397.42; B.I.C. obligated itself to pay Brown Lumber this amount.
In June 2007, B.I.C. began pouring the concrete slab for the house. After pouring the slab, B.I.C. discovered that the concrete that had been poured to form the slab had included one truck load that had begun to cure before it was poured and that the inclusion of the partially cured concrete had caused defects in the slab. B.I.C. attempted unsuccessfully to correct the defects in the slab.
B.I.C. framed the house in June 2007. The Presleys were dissatisfied with the framing because, despite the fact that the house plans specified that the main living area of the house should be framed for eight-foot ceilings, B.I.C. had framed it for nine-foot ceilings. Nonetheless, on June 29, 2007, the Presleys gave B.I.C. a check in the amount of $8,540, which represented payment of most of B.I.C.’s fee for performing its work under the May 26 contract — the Presleys withheld $1,000 of the fee because the house had not yet passed the final framing inspection.
When B.I.C. contacted Birmingham Sash to see if the doors and Silver windows had arrived, B.I.C. learned that Birmingham Sash had not ordered the doors and Silver windows because of the dispute regarding B.I.C.’s account. B.I.C. then asked Brown Lumber to obtain doors and windows that were as similar as possible to the ones that B.I.C. had ordered from Birmingham Sash. Brown Lumber obtained doors and windows that cost $3,514.49; the windows obtained by Brown Lumber were “Jordan” windows instead of Silver windows. With the $3,514.49 cost of the doors and windows, B.I.C. became obligated to pay Brown Lumber a total of $14,911.91 for the materials used in performing BJ.C.’s work under the May 26 contract.[1]
*615 On July 5, 2007, B.I.C. installed the doors and the Jordan windows provided by Brown Lumber. Before installing the doors and the Jordan windows provided by Brown Lumber, B.I.C. did not inform the Presleys that it had been unable to obtain the doors and Silver windows from Birmingham Sash, that it had asked Brown Lumber to obtain doors and windows that were as similar as possible to the doors and windows that Birmingham Sash was supposed to provide, or that it was going to install Jordan windows in the house instead of Silver windows. The Presleys went to the job site on July 5, 2007, and observed that B.I.C. had installed Jordan windows in the house because the windows had stickers on them identifying them as Jordan windows.
Following B.I.C.’s installation of the doors and windows on July 5, the Presleys sent B.I.C. a letter ordering B.I.C. to leave the job site, and B.I.C. obeyed the order. B.I.C. performed no more work after July 5, 2007, and the Presleys paid B.I.C. no more money. The three payments the Presleys had made to B.I.C. on May 29, May 30, and June 29 totaled $20,399.19.
On August 27, 2007, B.I.C. sent the Presleys a final invoice requesting payment in the amount of $9,022.50. The invoice reflected a credit of $484.66 for unused lumber and a credit of $3,705 for the estimated cost of repairing the defects in the concrete slab that B.I.C. had poured. Along with the August 27 letter, B.I.C. enclosed a copy of the May 21 quote they had obtained for doors and Silver windows from Birmingham Sash; B.I.C. did not enclose a copy of the invoice for the doors and Jordan windows Brown Lumber had provided. The Presleys did not pay B.I.C. any money as a result of the August 27 invoice.
In February 2008, the Presleys obtained a certificate of occupancy for the house and moved into the house.
In September 2007, the Presleys sued B.I.C., Grant, and Roberts (collectively referred to as “the defendants”). As finally amended, the Presleys’ complaint stated claims of breach of contract, breach of implied warranty of habitability, negligence, wantonness, misrepresentation, suppression, theft by deception, and unjust enrichment. The gravamen of the Pres-leys’ claims of breach of contract, breach of implied warranty of habitability, negligence, and wantonness was that B.I.C.’s work on the house did not conform to the contract and was not performed in a workmanlike manner. The gravamen of the Presleys’ misrepresentation and suppression claims was that the defendants had misled the Presleys into believing (1) that B.I.C. was qualified to perform the work it had agreed to perform on the house and (2) that B.I.C. would install particular doors to be provided by Birmingham Sash and Silver windows in the house. The gravamen of the Presleys’ theft-by-deception claim was that the defendants had fraudulently induced the Presleys to pay for work and materials that did not conform to the May 26 contract. The gravamen of the Presleys’ unjust-enrichment claim was that the defendants had retained money the Presleys had paid them for work and materials that did not conform to the contract. The Presleys sought to recover damages for the diminution in value of the house allegedly caused by the defendants’ failure to perform in accordance with the May 26 contract and in a workmanlike manner. The Presleys also sought to recover damages for mental anguish they had allegedly suffered as a result of the defendants’ alleged breach of contract, misrepresentation, and suppression. In addition, the Presleys sought restitution of money they had allegedly paid *616 the defendants for work and materials that did not conform to the May 26 contract.
The defendants denied liability, and the action proceeded to trial before a jury. During the Presleys’ case-in-chief, Joy Presley, on direct examination, testified as follows regarding (1) how much the fair market value of the house would have been if the house had been constructed in accordance with the May 26 contract and (2) how much the fair market value of the house was as actually constructed:
“Q. Do you have a judgment as to the fair market value of that house if it had been done in accordance with the plans and specifications and the way you had contracted to do it?
“A. Yes, sir.
“Q. What’s that?
“A. $170,000.
“Q. And do you have an opinion about what the fair market value is now as a result of the — all those features that you didn’t get and the problems that you have had?
“A. Yes, sir, 74,000.”
On cross-examination, Joy Presley testified as follows regarding those opinions:
“Q. ... Your belief as you’re on the stand there, is that this house right here (indicating) the house you and your husband live in should be worth 170,000 and is only worth 74?
“A. Yes, sir.
“Q. Almost a hundred thousand dollars decrease in value on this home?
“A. Yes, sir, I do.
“Q. And that’s your belief; correct?
“A. Well, it’s based on some things, yes, sir.
[[Image here]]
“Q. Okay. You had said earlier that you thought the home — the fair market value for the home would have been $170,000?
“A. Yes, sir.
“Q. And you think it’s worth to you only 74,000; is that right?
“A. Well, you asked me what the fair market value is and the documents that I got from Jefferson County, that’s what they think it’s worth. So that’s what I base my opinion on.”
(Emphasis added.) The record indicates that the “documents” from Jefferson County that Joy Presley was referring to in her testimony was the assessment of the ad valorem taxes on the Presleys’ property prepared by the Jefferson County Tax Assessor (“the tax assessor’s assessment”). After Joy Presley testified that she had based her opinion of the fair market value of the house as actually constructed on the tax assessor’s assessment, the trial court struck that opinion on the ground that the tax assessor’s assessment was not admissible evidence of the fair market value of the house.
On redirect examination, Joy Presley again testified that it was her opinion that the fair market value of the house as actually constructed was $74,000, and the trial court again struck that opinion because it was based on the inadmissible tax assessor’s assessment.
The Presleys then sought to recall Richard Presley as a witness to testify regarding his opinion of the fair market value of the house as actually constructed. Counsel for the defendants, however, sought and obtained leave from the trial court to question Richard Presley on voir dire examination outside the presence of the jury. Richard Presley testified on voir dire as follows:
“Q. [Counsel for the defendants]: Mr. Presley, do you have an opinion as to what the fair market value of your home is as it sits there today?
*617 “A. Yes, sir, my opinion, yes, sir.
“Q. What is your opinion as to the value of your home as it sits there today?
“A. About $170,000.
“Q. And what is your opinion—
“A. I’m sorry, excuse me. Sorry. As it sits, no. That would be the fair market value that I would place on it.
“Q. Well, what’s your opinion as to fair market value of your home as it sits there today?
“A. As it sits with all of the repairs it needs, my opinion would be probably 74, 75,000.
“Q. What is your opinion based on?
“A. Just considering all of the things that need to be done to that house to make it like what we wanted it to be. “Q. Where did you come up with that number, $74,000, how’d you get there?
“[Counsel for the Presleys]: He said 74, 75,1 think.
“Q. How did you come up with the number of 74,000 to 75,000? How did you come up with that value?
“A. Just my opinion of what it would take to make that house be what it should be.
“Q. Well, do you know what fair market value means?
“A. I know what it’s insured for, I don’t know—
“Q. Do you know what it means? What fair market value means?
“A. To who?
“Q. Do you know what the word fair mark[et] value means?
“A. I have a basic understanding, yes, sir.
“Q. What is that understanding?
“A. What the house would bring to someone that really [wanted] that kind of house, I guess.
“Q. So in other words, the value of that home is what somebody else would pay for it; correct?
“A. It would have to be the house that they wanted.
“Q. I understand, but we’re talking about people in the market; correct?
“[Counsel for the Presleys]: He’s arguing with him, Your Honor. He’s already given his understanding of what fair market value is and it’s much better than what I could have given in a law book.
“[Counsel for the defendants]: Your Honor, just so we’re clear, this is voir dire, this is not testimony. The man doesn’t know what fair market value is. He’s trying to say $74,000 is the value based upon what he thinks it’s going to take to do all the things he wants to do to it. So in other words, he’s taking what he thinks the fair market value is of 170,000 and he’s reducing it by all of the things he thinks he needs to do to it. But he’s not testified as to what fair market value is. So therefore, I’m entitled to know what he thinks fair market value means.
“THE COURT: Proceed.
“Q. What do you think fair market value means, Mr. Presley?
“A. It would mean the value of a home to a [prospective] buyer, in his eyes, what he would be willing to give for that particular real estate.
“Q. Okay. And do you [have] any basis to believe that any other buyer would choose to lower the ceilings in your home to eight feet?
“A. Say that again, please?
“Q. Do you know what somebody would pay for this house on the open market as it sits there today?
“A. No, sir, I don’t.
*618 “Q. Okay. And, in fact — where are you getting these numbers from that you think that you’re going to have to spend to fix your house up to get it the way that you wanted?
“A. I’m trying to visualize and realize all the construction time, you know, it would take and move in expenses and our living expenses and everything involved to get it to [the] house that we actually contracted them to build.
[[Image here]]
“Q. Where are you getting these numbers from, is it coming from the estimates and stuff you have that you got from the concrete people and window people?
“A. Just from past experiences, just estimates I guess or guesstimates.
“Q. Guesstimates?
“A. In my opinion, yes, sir.
“Q. Now, you remember when I ask[ed] you if you had an opinion as to value of your home back during your deposition?
“A. Vaguely, yes, sir.
“Q. Let me show you your deposition, transcript. Would you take a look at page 115 of your deposition transcript for me?
“A. Okay.
“Q. Okay. Now, I asked you, do you think that the house ... as it sits there, the one that you and your wife now live in, has any value? What did you tell me[?]
“A. Has any value? Yes, sir.
“Q. And I said you don’t have an opinion what that is? What did you tell me?
“A. That I’m not an appraiser and I don’t know the value.
“Q. And I said, do you think that the house with nine foot ceilings on the main living area is worth more than a house with eight foot ceilings? What did you tell me?
“A. Not to me.
“Q. And then I said, what about on the market in general and the real estate market, do you have any knowledge? What did you tell me?
“A. No knowledge.”
(Emphasis added.) Counsel for the defendants then objected to Richard Presley’s testifying before the jury regarding his opinion of the fair market value of the house as actually constructed on the ground that he did not actually have an opinion of its fair market value, i.e., the price at which a willing seller and a willing buyer would agree to a sale of the house, and the trial court sustained the objection.
The Presleys rested their case-in-chief without offering any other evidence establishing the fair market value of the house as actually constructed. Consequently, although the jury had before it Joy Presley’s opinion that the house would have had a fair market value of $170,000 if it had been constructed in accordance with the contract and in a workmanlike manner, it did not have before it any evidence establishing the fair market value of the house as actually constructed. Thus, the evidence before the jury did not establish that the failure of B.I.C. to construct the house in accordance with the contract and in a workmanlike manner had diminished the fair market value the house would have had if it had been constructed in accordance with the May 26 contract and in a workmanlike manner.
After the Presleys rested their case-in-chief, the defendants moved the trial court for a JML. The trial court heard the arguments of counsel regarding the motion and then orally granted the motion.
Subsequently, the trial court entered a written order granting the motion and ex *619 plaining its rationale. The trial court stated that the defendants were entitled to a JML with respect to the Presleys’ claims of breach of contract, negligence, wantonness, misrepresentation, and suppression because the Presleys had failed to introduce substantial evidence proving an essential element of those claims, i.e., damage. The trial court explained that the Presleys had failed to prove that the failure of B.I.C. to construct the house in accordance with the May 26 contract and in a workmanlike manner had diminished the fair market value the house would otherwise have had. The trial court also stated that the Presleys could not recover damages for mental anguish because they had not introduced evidence establishing that the defendants’ breach of contract involved defects in the construction that had rendered the house virtually uninhabitable, as required by Baldwin v. Panetta, 4 So.3d 555 (Ala.Civ.App.2008). The trial court stated that the defendants were also entitled to a JML with respect to the misrepresentation and suppression claims insofar as they were based on the allegation that the defendants had misled the Presleys into believing that B.I.C. was qualified to perform its work because the Presleys had failed to introduce substantial evidence tending to prove that B.I.C. was not qualified. The trial court stated that the defendants were entitled to a JML with respect to the Presleys’ misrepresentation and suppression claims insofar as they were based on the allegation that the defendants had misled the Presleys into believing that B.I.C. would install particular doors to be obtained from Birmingham Sash and Silver windows because the Pres-leys had failed to prove two of the essential elements of promissory fraud, i.e., (1) that the defendants intended not to install those doors and windows at the time they indicated that B.I.C. would install them and (2) that the defendants intended to deceive the Presleys when they indicated that B.I.C. would install those doors and windows. The trial court stated that the defendants were also entitled to a JML with respect to the Presleys’ claim of wantonness because the Presleys had failed to introduce substantial evidence indicating that the defendants had acted wantonly. In addition, the trial court stated that the defendants were entitled to a JML with respect to the Presleys’ unjust-enrichment claim because the Presleys had failed to introduce substantial evidence indicating that, as a result of fraud or mistake, the Presleys had paid the defendants money to which the defendants were not entitled. Finally, the trial court stated that it was granting the motion for a JML with respect to the claims of breach of an implied warranty of habitability and theft by deception because the Presleys had conceded that the motion was due to be granted with respect to those claims.
Following the entry of the trial court’s written order granting the defendants’ motion for a JML, the Presleys timely appealed to the supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
“The standard of review of a motion for a JML is well established:
“ ‘When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992).... A reviewing court must determine whether the party who bears the burden of proof *620 has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996).’ ”
DCH Healthcare Auth. v. Duckworth, 883 So.2d 1214, 1217 (Ala.2003) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala.1999)). “[Sjubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
The Presleys have not argued in their brief on appeal that the trial court erred in granting the motion for a JML with respect to (1) their claim of breach of contract insofar as it sought recovery of damages for mental anguish; (2) then-claims of misrepresentation and suppression insofar as those claims were based on allegations that the defendants had misled the Presleys into believing that B.I.C. was qualified to perform its work and that the defendants had misled the Presleys into believing that B.I.C. would install particular doors to be obtained from Birmingham Sash in the house; (3) their claim of breach of implied warranty of habitability, and (4) their claim of theft by deception. Therefore, we treat those claims as having been abandoned by the Presleys, and we affirm the trial court’s judgment with respect to them. See Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317, 319 (Ala.2003) (“In his brief to this Court Tucker ... never expresses disagreement with the dismissal of his fraud claim or the summary judgment as to his claim alleging ‘other wrongful conduct.’ Apparently, he has elected not to pursue those claims. ‘When an appellant fails to properly argue an issue, that issue is waived and will not be considered. Boshell v. Keith, 418 So.2d 89 (Ala.1982).' Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996). ‘An appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless presented and argued in brief. Ex parte Riley, 464 So.2d 92 (Ala.1985).’ Braxton v. Stewart, 539 So.2d 284, 286 (Ala.Civ.App.1988). Accordingly, we treat the fraud claim and the claim alleging ‘other wrongful conduct’ as having been abandoned by Tucker, and we affirm the judgments as to those claims.”); see also Newson v. Protective Indus. Ins. Co. of Alabama, 890 So.2d 81, 86 (Ala.2003) (“[O]n appeal the Newsons do not argue their claim against PIICO for negligent or wanton hiring, training, and supervision, and thus the Newsons abandon this claim.”).
The Presleys first argue that, because they were the owners of the house, they were entitled to express their opinion of the fair market value of the house as actually constructed and that, therefore, the trial court erred in rejecting their opinions on that subject.
“It is well-settled that any person, including a layman, is competent to testify to his opinion concerning the value of land if he has had an opportunity for forming a correct opinion and testifies in substance that he has done so. State v. Woodham, 292 Ala. 363, 294 So.2d [740] (1974). The owner of land, by virtue of his ownership, is considered prima facie qualified to testify to its value without *621 any further showing. Shelby County v. Baker, 269 Ala. 111, 110 So.2d 896 (1959).”
State v. Steele, 374 So.2d 325, 329 (Ala.1979).
Joy Presley testified that, in her opinion, the house had a fair market value as actually constructed of $74,000; however, she indicated, on cross-examination, that her opinion was based solely on the value used by the tax assessor in assessing the Presley’s property for ad valorem taxes. Although a tax-assessment record may overcome a hearsay objection because it qualifies as a public record for purposes of Rule 803(8), Ala. R. Evid., it nonetheless is not admissible to establish the fair market value of property. See State v. Griffith, 292 Ala. 123, 124-25, 290 So.2d 162, 163-64 (1974), and 2 Charles W. Gamble, McElroy’s Alabama Evidence § 267.04 (5th ed.1996).
“A tax assessing authority’s record of land value assessment would likely qualify, over a hearsay objection, as a public record....
“A tax assessment record, however, is not guaranteed admission just because it surmounts a hearsay objection. Alabama courts have long embraced the principle that generally the tax assessing authority’s evaluation is not relevant when offered to prove market value. The rationale underlying this general exclusionary rule is that ‘it is notorious that properties are not assessed at anything like true value or market value.’ This principle, however, results in the exclusion of such a tax record only when offered to prove market value.”
2 C. Gamble, McElroy’s Alabama Evidence § 267.04 (footnotes omitted).
Although the owner of land is prima facie competent to testify regarding its value, prima facie competence, by definition, can be rebutted. See Black’s Law Dictionary 1224 (8th ed.2004) (“rebuttable presumption. An inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence. — Also termed prima facie presumption.... ”). By testifying that she had based her opinion regarding the fair market value of the house as actually constructed solely on the tax assessor’s inadmissible valuation of the Presleys’ property, Joy Presley rebutted her own presumption of competence. Accordingly, we conclude that the trial court did not err in rejecting her opinion regarding the fair market value of the house as actually constructed. See State v. Steele, supra; State v. Griffith, supra; and 2 C. Gamble, McElroy’s Alabama Evidence § 267.04.
The dissent contends that “[t]he fact that [Joy Presley’s] opinion was based on a tax assessment would go to the weight of the evidence, not its admissibility.” 64 So.3d at 626. Given that Joy Presley indicated that the tax assessor’s inadmissible assessment was the sole basis for her opinion regarding the fair market value of the house as actually constructed, the effect of the dissent’s position would be to accord Joy Presley an irrebuttable presumption of competence to testify regarding the value of her property merely because she is one of its owners. But the law only accords the owner of property a prima facie, or rebuttable, presumption of competence. See State v. Steele, supra. As noted above, Joy Presley herself rebutted the presumption that she was competent to express an opinion regarding the fair market value of her property as actually constructed by testifying that the sole basis of her opinion was the tax assessor’s inadmissible assessment.
Richard Presley testified that he did not have an opinion regarding the fair market value of the house as actually con *622 structed. Accordingly, Richard Presley also rebutted his own prima facie presumption of competence to testify regarding the fair market value of the house as actually constructed. Id.[2] Accordingly, we conclude that the trial court did not err in rejecting Richard Presley’s opinion regarding the fair market value of the house as actually constructed.
The Presleys also argue that the trial court erred in granting the defendants’ motion for a JML with respect to their claims of breach of contract, negligence, misrepresentation, and suppression on the ground that the Presleys had failed to prove damage, an essential element of each of those claims. See State Farm Fire & Cas. Co. v. Williams, 926 So.2d 1008, 1013 (Ala.2005) (“In order to prevail on a breach-of-contract claim, a plaintiff must establish: (1) the existence of a valid contract binding the parties, (2) his own performance under the contract, (3) the defendant’s nonperformance under the contract, and (4) resulting damages. State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293 (Ala.1999).” (emphasis added)); Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330, 335 (Ala.2006) (“Damages are an essential element of the tort of negligence. ‘ “ ‘[P]roof of damage [is] an essential part of the plaintiffs case.’ ” ’ Ex parte Stonebrook Dev., L.L.C., 854 So.2d 584, 589 (Ala.2003) (quoting Matthews Bros. Constr. Co. v. Stonebrook Dev., L.L.C., 854 So.2d 573, 578 (Ala.Civ.App.2001), quoting in turn William C. Prosser, Handbook of the Law of Torts § 30 (4th ed.1971)).”); Luck v. Primus Auto. Fin. Servs., Inc., 763 So.2d 243, 245-46 (Ala.2000) (“A party alleging fraud by misrepresentation must prove four elements: (1) that the defendant made a false representation concerning an existing material fact; (2) that the defendant made that misrepresentation while knowing that it was false, or made it recklessly, or made it with no knowledge as to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation; and (4) that the plaintiff incurred damage proximately caused by the reliance. Ex parte Government Employees Ins. Co., 729 So.2d 299, 304 (Ala.1999).” (emphasis added)); and Drummond Co. v. Walter Indus., Inc., 962 So.2d 753, 783 (Ala.2006) (“In State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1998), this Court recognized that in order to establish a fraudulent-suppression claim, a plaintiff must show: ‘(1) [T]hat [the defendants] had a duty to disclose an existing material fact; (2) that [the defendants] suppressed this material fact; (3) that [the defendants’] suppression of this fact induced [the plaintiff] to act or to refrain from acting; and (4) that [the plaintiff] suffered actual damage as a proximate result.’ 729 So.2d at 837.” (emphasis added)). Specifically, the Presleys argue that they proved the element of damage with respect to each of those claims because they introduced admissible evidence in the form of the opinions of the Presleys establishing the diminution in the value of the house allegedly caused by the defendants’ breach of contract, negligence, misrepresentation, and suppression. However, because we conclude, for the reasons discussed above, that the trial court did not err in rejecting the Presleys’ opinions regarding the fair market value of the house as actually constructed, we find no merit in the Presleys’ argument that they proved damage in the form of the diminution in value of the house.
*623 In addition to contending that the Presleys proved the element of damage with respect to their claims of breach of contract and negligence through Joy Presley’s opinion regarding the diminution in the fair market value of the house, the dissent also contends that the Presleys proved the element of damage by introducing substantial evidence indicating (1) “that the house as constructed was of lower quality than the house they had hired B.I.C. to build” and (2) “that they had to pay for repairs to the house.” 64 So.3d at 627. However, we cannot reverse the JML on the basis of arguments that the Presleys did not present to the trial court in opposition to the motion for a JML. See Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000) (“[T]he appellate court can consider an argument against the validity of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting that argument to the trial court before or at the time of submission of the motion for summary judgment.” (citing Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992) (emphasis omitted))). In opposing the motion for a JML, the Presleys did not argue to the trial court that they had proved the element of damage with evidence indicating that the house that was built was of lower quality than the one they had hired B.I.C. to build or with evidence indicating that they had had to pay for repairs to the house; they only argued that they had proved it with Joy Presley’s opinion regarding the diminution in the fair market value of the house. The following quote taken from their counsel’s argument in opposition to the motion for a JML epitomizes the Presley’s position regarding their proof of the element of damage:
“With regard to the contract claims, Your Honor, and the negligent claims in the construction, the measure of damages in the breach of contract claim, not breach of contract, not breach of warranty but in the breach of contract, we contracted this work, they failed to do this work. We testified to the before and after value, so we testified — they were contracted to put in eight foot ceilings, to do slab work, to square it out, and for windows and doors. They failed on each of those incidences. We were damaged as a result of it. The market value, the diminution in value of our property was testified to by Mrs. Presley and in light most favorable to my clients, those claims for breach of contract, count number 1, negligence, and wantonness, count number 3, I believe. Unjust enrichment — our claims that should remain in the case if Your Honor makes the determination that — that the fair market value is evidence that can come in.”
(Emphasis added.) Thus, because the Presleys did not argue to the trial court that they had proved the element of damage with evidence indicating that the house that was built was of lower quality than the one they had hired B.I.C. to build or with evidence indicating that they had had to pay for repairs to the house, we cannot reverse the trial court’ judgment on the basis of those arguments. See Ex parte Ryals, supra.
The Presleys also argue that, with respect to their claims of willful misrepresentation and willful suppression, they proved damage in the form of mental anguish. The defendants, on the other hand, argue that the Presleys have waived this argument because they did not present it to the trial court in opposition to the defendants’ motion for a JML. The Presleys counter by arguing in their reply brief that they sufficiently raised the argument by including a prayer for damages for mental anguish in the ad damnum clause of their claims of misrepresentation and suppres *624 sion in their complaint. However, as noted above, we can consider an argument attacking the validity of a JML only to the extent that it was presented to the trial court before or at the time of submission of the motion for a JML. See Ex parte Ryals, supra. The Presleys’ prayer for damages for mental anguish in the ad damnum clause of their claims of misrepresentation and suppression in their complaint was not tantamount to opposing the defendants’ motion for a JML on the ground that the Presleys had proved damage with respect to their claims of willful misrepresentation and willful suppression because they had proved that they had suffered mental anguish. Id. Therefore, we cannot consider such an argument on appeal. Id.
The Presleys do not argue that they proved damage in any other form. Therefore, they have waived any such argument they may have had. See Tucker v. Cullman-Jefferson Counties Gas Dist., supra.
The Presley’s third argument is that the trial court erred in concluding that the Presleys had failed to prove a prima facie case of misrepresentation or suppression insofar as the Presleys based those claims on allegations that the defendants misled the Presleys into believing that B.I.C. would install Silver windows. However, this argument is unavailing because, as we explained above, the trial court correctly concluded that the Presleys had failed to prove damage, which is an essential element of claims of misrepresentation and suppression. See Luck v. Primus Auto. Fin. Servs., Inc., supra; and Drummond Co. v. Walter Indus., Inc., supra.
The Presleys’ fourth argument is that the trial court erred in granting the defendants’ motion for a JML with respect to the Presleys’ wantonness claim on the ground that the Presleys had failed to prove that the defendants acted wantonly. Devoting less than one page of their brief to this argument, the Presleys merely argue in a conclusory fashion that “the defendants acted consciously and intentionally in failing to follow the approved plans with respect to the height of the ceilings; knowingly failed to purchase [the] proper windows and doors; and failed to properly construct and/or supervise the construction of the concrete slab.”
“ ‘ “ ‘Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
“ ‘ “ ‘Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as ... a conscious ... act. “Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.” McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913)....”””
Ex parte Essary, 992 So.2d 5, 9-10 (Ala.2007) (quoting Tolbert v. Tolbert, 903 So.2d 103, 114-15 (Ala.2004), quoting in turn Ex parte Anderson, 682 So.2d 467, 470 (Ala.1996), quoting in turn Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145-46 (Ala.1987)) (emphasis omitted).
In the case now before us, the evidence indicated that the defendants’ failure to perform their work in accordance with the May 26 contract and in a workmanlike *625 manner resulted from a lack of due care rather than a conscious act or omission. Therefore, we find no merit in the Pres-leys’ argument that the trial court erred in granting the defendants’ motion for a JML with respect to the Presleys’ wantonness claim. See Ex parte Essary, supra.
The Presleys’ final argument is that the trial court erred in concluding that they had failed to prove a prima facie case of unjust enrichment. The Presleys argue that they proved a prima facie ease of unjust enrichment because, they say, they introduced substantial evidence establishing that, through fraud or mistake, they paid B.I.C. $4,459.19 for doors and windows while B.I.C. purchased lesser quality doors and windows for $3,514.49 and unjustly retained the difference in the amount of $944.70. Thus, according to the Presleys, they proved that B.I.C. had been unjustly enriched in the amount of $944.70.
The defendants, on the other hand, argue that the trial court properly granted their motion for a JML with respect to the Presleys’ unjust-enrichment claim because the evidence established that B.I.C.’s expenses for materials used in the construction of the house as a whole exceeded the amount the Presleys paid B.I.C. for those expenses.
“In order for a plaintiff to prevail on a claim of unjust enrichment, the plaintiff must show that
“ ‘the “ ‘defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.’ ” Dickinson v. Cosmos Broad. Co., 782 So.2d 260, 266 (Ala.2000) (quoting Hancock-Hazlett Gen. Constr. Co. v. Trane Co., 499 So.2d 1385, 1387 (Ala.1986)).... “The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.” Battles v. Atchison, 545 So.2d 814, 815 (Ala.Civ.App.1989).’
“Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1123 (Ala.2003). “ ‘One is unjustly enriched if his retention of a benefit would be unjust.’” Welch v. Montgomery Eye Physicians, P.C., 891 So.2d 837, 843 (Ala.2004) (quoting Jordan v. Mitchell, 705 So.2d 453, 458 (Ala.Civ.App.1997)). The retention of a benefit is unjust if
“ ‘ “(1) the donor of the benefit ... acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.” ’
“Welch, 891 So.2d at 843 (quoting Jordan, 705 So.2d at 458). The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case. Heilman, supra,”
Mantiply v. Mantiply, 951 So.2d 638, 654-55 (Ala.2006) (emphasis omitted).
The evidence established that the Pres-leys paid B.I.C. a total of $11,859.19 for the cost of lumber, doors, and windows.[3] The evidence further established that B.I.C. obligated itself to pay Brown Lumber a total of $14,911.91 for the materials used to frame the house, the materials used to build the deck frame and front steps, and the doors and windows. Thus, *626 the amount that B.I.C. obligated itself to pay Brown Lumber for materials it incorporated into the house exceeded the amount that the Presleys paid B.I.C. for those materials by $3,052.72. Accordingly, the trial court did not err in concluding that the Presleys had failed to establish that B.I.C. had been unjustly enriched.
For the reasons discussed above, we affirm the judgment of the trial court.
AFFIRMED.
THOMAS and MOORE, JJ., concur.
PITTMAN, J., concurs in the result, without writing.
THOMPSON, P.J., concurs in part and dissents in part, with writing.

. The $14,911.91 included the $11.397.42 that B.I.C. had already obligated itself to pay Brown Lumber for materials used in framing the house and building the deck frame and front steps.

. The Presleys have not raised the issue whether the cost of repairing the defects in the construction was a proper measure of damages in this case and have not presented argument regarding that issue; therefore, they have waived that issue. See Tucker v. Cullman-Jefferson Counties Gas Dist., supra.

. $7,400 for lumber plus $4,459.19 for doors and windows equals $11,859.19.