Rel: January 17, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

### SC-2024-0013

_____

## MBN 500-1200 Buildings, LLC

### v.

## Alabama Department of Revenue

## Appeal from Shelby Circuit Court
## (CV-18-900604)

_____

### SC-2024-0014

_____

**MBN Building 300, LLC**

**v.**

**Alabama Department of Revenue**

**Appeal from Shelby Circuit Court**
**(CV-18-900605)**

COOK, Justice.

SC-2024-0013 -- AFFIRMED. NO OPINION.

SC-2024-0014 -- AFFIRMED. NO OPINION.

See Rule 53(a)(1) and (a)(2)(F), Ala. R. App. P.

Shaw, Wise, Sellers, Mendheim, Stewart, and Mitchell, JJ., concur.

Cook, J., concurs specially, with opinion.

Parker, C.J., dissents.

2

COOK, Justice (concurring specially).

I concur fully with this Court's decision to affirm the judgments. I write specially, however, because this case illustrates how a rule of evidence can help generate a result that some might consider mistaken and to explain why the applicable rule of evidence in these cases might need to be reconsidered.

## Background

To summarize a complicated record, MBN Building 300, LLC, and MBN 500-1200 Buildings, LLC (collectively referred to as "MBN"), each own commercial office buildings in Hoover. After the Shelby County Tax Commissioner's Office assessed the fair market values of those buildings -- Building 300, Building 500, and Building 1200 -- for the 2018 tax year, MBN challenged those assessments before the Shelby County Board of Equalization and Adjustments ("the BOE"). The BOE affirmed the Commissioner's assessments.

MBN then appealed those assessments[1] to the Shelby Circuit

---

[1]MBN initially appealed only the BOE's assessed values for the buildings for the 2018 tax year, but the assessed values for the 2019, 2020, 2021, 2022, and 2023 tax years were subsequently added to the appeals below.

Court[2] and requested a jury trial to determine the fair market values of those buildings. After the Alabama Department of Revenue ("ADOR") filed a notice of appearance and became the named "appellee" in the appeals below,[3] the cases were tried together.

I. The Trial

The jury had a tough assignment. Establishing the fair market value for a commercial office building is not simple or exact. There are far fewer comparable sales as would exist for ordinary home sales. Establishing a value is especially difficult when, as here, one of the buildings at issue -- Building 300 -- produced no income and had no tenants during any of the pertinent tax years (and Building 500 had no tenants for a significant number of those years). For the purposes of this writing, I note that MBN and ADOR presented the following relevant evidence and arguments to the jury concerning the valuations for the

---

[2]See §§ 40-3-24 and 40-3-25, Ala. Code 1975.

[3]The BOE initially entered a limited appearance in the appeals for the purpose of submitting its "Certified Statement of Assessment or Valuation" for the buildings pursuant to § 40-3-25, Ala. Code 1975. ADOR subsequently filed a notice of appearance, see § 40-3-26(b), Ala. Code 1975, and became the named "appellee" in the appeals below.

pertinent tax years.

### A. ADOR's Expert-Opinion Testimony

At trial, ADOR explained the methods used by the Shelby County Tax Commissioner and the BOE to arrive at the assessed values in these cases and argued that the way they assessed the values for the buildings was more reliable than the expert testimony of the appraisers offered by MBN. In support of this position, ADOR had Lisa Cooley, the chief appraiser of the Shelby County Tax Commissioner's Office, testify as an expert witness.

Cooley testified that the original assessed values set by the Commissioner were determined by using the "cost approach." To arrive at those values, Cooley explained that the tax assessor inventoried all improvements to the buildings, estimated the current cost to construct similar buildings, and discounted for depreciation. Cooley also testified that the cost approach was generally accepted and was a good way to value the buildings.

Additionally, Cooley testified that, in completing the assessment process, the BOE engages in "mass appraisal" and "equalization." As part of the BOE's "mass-appraisal" process, Cooley explained, the BOE

"equalizes" assessed tax values so that similar properties in a similar area are "treated equally." As part of that process, she stated, the BOE considers the market in areas with "the same attributes, the same traffic counts, the same school district, [and] the same city limit." Properties that are of the same "building types" within each of those areas are considered together. Cooley testified that only rarely can a building deviate from its equalized value.[4]

Cooley further explained that, as a part of this mass-appraisal process, the Shelby County Tax Commissioner's Office reviews actual property sales of only "validated properties" in similar areas and calculates per-square-foot values, which are then compared to all appraised tax values in the area. According to Cooley, the Shelby County Tax Commissioner's Office must forward its validated properties to ADOR. The assessed values, she explained, are required to be between 98% and 102% of those validated sale prices.

---

[4]When asked why a property would be valued differently from the properties used to equalize it, Cooley explained that there would be a deviation if a specific property has "structural damages," like if "tornadoes come through, and maybe it hit one building and it didn't [hit] other[s]." Even if a deviation from the equalized value is permitted due to structural damage, however, Cooley explained that the deviation is removed once the damage is repaired.

Finally, Cooley claimed that mass appraisal is not subjective and is designed to eliminate "all guesswork" and "all uncertainty." Cooley contrasted the BOE's mass-appraisal approach with MBN's approach, which she described as being "very opinionated."

Notably, Cooley also testified that the Shelby County Tax Commissioner's Office would consider any income information provided by the property owner and would appraise the property using an "income approach," if requested. However, no such documentation was provided by MBN before it initiated the appeals below regarding Building 300 and Building 500. One possible reason for MBN's not doing so could have been because Building 300 had no tenants during any of the pertinent tax years and because Building 500 had no tenants for a significant portion of those years. As a result, there was no "income" that could have been submitted for consideration.

### B. MBN's Evidence

During its case-in-chief at trial, MBN argued that the methods employed by the Shelby County Tax Commissioner's Office and the BOE were unreliable. MBN argued that Cooley's testimony was inadmissible because it was irrelevant (at least to the extent that it concerned BOE's

internal processes) and because she had testified about buildings and methods with which she had no personal familiarity. MBN also argued that its methods of valuation were superior. In support of its assertions, MBN presented expert testimony from various appraisers and commercial real-estate brokers who had experience valuing properties like the buildings at issue here.

For instance, during their testimony, MBN's experts were asked about the BOE's use of sales for mass appraisal. Relying on that testimony, MBN argued that the BOE's method was fundamentally flawed because the "validated properties" used by the BOE were not comparable to MBN's buildings. Specifically, MBN argued that the BOE intentionally ignored sales of properties involving trusts and otherwise failed to consider other properties that were larger commercial buildings.

MBN also alleged that the best evidence of a property's value is what a willing buyer will pay a willing seller. See Morgan Cnty. Bd. of Equalization v. Indorama Ventures Xylenes & PTA, LLC, [Ms. SC-2023-0183, Mar. 22, 2024] ____ So. 3d ____, ____ (Ala. 2024) (recognizing that "fair market value" of a piece of property is "'"'the sum arrived at by fair negotiation between an owner willing to sell and a purchaser willing to

buy, <u>neither being under pressure to do so</u>'"'"(quoting <u>Mt. Carmel Estates, Inc. v. Regions Bank</u>, 853 So. 2d 160, 166 (Ala. 2002)) (emphasis added)); § 40-1-1(16), Ala. Code 1975 (defining the term "value" as the "fair and reasonable market value of property, estimated at the price which the property would bring at a fair voluntary sale").

For instance, although MBN disputed the valuations for three of its buildings, it especially disagreed with the values assessed for Building 300. The record reflects that, in 2017, MBN purchased Building 300 for $2,500,000. During the pertinent tax years, MBN was never able to secure a tenant for that building and, thus, that building sat completely empty for six years.

In July 2023, however, MBN sold Building 300 for $5,000,000. According to MBN, the prices at which it purchased and then later sold Building 300 were the best evidence of that building's fair market value because those prices reflected what a willing buyer would pay a willing seller for that property. Thus, MBN argued, those values should have been used in calculating the ad valorem taxes against it. Nevertheless, the values set by the Commissioner and the BOE for the ad valorem taxes for that building ranged from $9,650,590 for the 2018 tax year to

9

$12,434,060 for the 2023 tax year.

#### C. The Jury's Verdicts

Following a contentious four-day trial, the jury returned verdicts setting the fair market values for Building 300, Building 500, and Building 1200 for each of the pertinent tax years. Although those values were less than the original valuations affirmed by the BOE, they were far closer to the BOE's valuations than the values advocated by MBN. In particular, for Building 300, the jury found a value of approximately $10,000,000 (varying over time) -- despite the actual sale of that building for $5,000,000.

#### II. The Present Consolidated Appeals

After MBN's motions for a new trial or, in the alternative, to alter or amend the judgments entered on the jury's verdicts, were denied, MBN filed the present consolidated appeals with this Court, pursuant to § 40-3-25(d), Ala. Code 1975.[5] In these appeals, MBN has challenged only the judgments concerning Building 300 and Building 500.

---

[5]That Code section states, in relevant part: "From the judgment of the circuit court, either the state or the taxpayer may appeal directly to the Supreme Court of Alabama within 42 days of the entry of the judgment." (Emphasis added.)

Discussion

One of the key arguments raised by MBN both during trial and in the present consolidated appeals is that the expert testimony presented by ADOR, explaining the methods used to calculate the values underlying the assessed ad valorem taxes, is unreliable. This special writing concerns the evidentiary standard used to admit that expert testimony, which, as explained below, is lower because the testimony at issue was not "scientific" in nature.

## I. Alabama's Rule Governing Expert Testimony -- Rule 702, Ala. R. Evid.

In Alabama, expert testimony is generally governed by Rule 702(a), Ala. R. Evid., which provides a modest standard for parties to meet. That rule states, in relevant part:

> "(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

However, expert testimony that is based on a "scientific theory, principle, methodology, or procedure" must also meet the requirements of Rule 702(b), Ala. R. Evid., which states:

"(b) In addition to the requirements in section (a), expert testimony based on a scientific theory, principle, methodology, or procedure is admissible only if:

"(1) The testimony is based on sufficient facts or data;

"(2) The testimony is the product of reliable principles and methods; and

"(3) The witness has applied the principles and methods reliably to the facts of the case."

Before such testimony can be presented at trial, our courts require "the proponent of scientific evidence to show that such evidence is 'reliable' by establishing the scientific validity (i.e. reliability) of the scientific theory, principle, methodology, or procedure that the expert relied upon in forming his or her conclusions." 2 Charles W. Gamble et al., McElroy's Alabama Evidence §127.03(1) (7th ed. 2020) (footnote omitted).

From the early 1950s until 2012, courts in Alabama used the "general acceptance" test announced in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923), to evaluate the evidentiary reliability of scientific evidence offered during trial. See id.[6] Now, when it comes to the

---

[6]Under that test, "a person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the

12

admissibility of expert testimony based on <u>scientific opinions</u>, courts in Alabama apply Rule 702(b), which is based on a modified version of the test that was announced in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and is used in federal courts.[7]

Unlike in Alabama, at the federal level, <u>all expert testimony</u> -- whether scientific or nonscientific -- is subject to the more exacting <u>Daubert</u> standard. <u>See, e.g.</u>, <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999) (recognizing that the <u>Daubert</u> analysis applies to all

---

expert is testifying." <u>Slay v. Keller Indus., Inc.</u>, 823 So. 2d 623, 626 (Ala. 2001).

[7]I note briefly that the admissibility criteria in <u>Daubert</u> was formally adopted through an amendment to Rule 702, Ala. R. Evid., that became effective on January 1, 2012. <u>See</u> Rule 702(b), Ala. R. Evid. <u>See also</u> Advisory Committee Notes to Amendment to Rule 702, Ala. R. Evid., Effective January 1, 2012 (explaining that "[t]he language in subsections (b)(1), (b)(2), and (b)(3) is identical to language added to Rule 702 of the Federal Rules of Evidence in response to the United States Supreme Court's decision in <u>Daubert</u> …. The amendment adopts the approach taken in <u>Daubert</u> for determining the admissibility of scientific evidence."). That amendment was adopted to make Rule 702 consistent with a legislative amendment to Alabama's statute on expert witnesses -- § 12-21-160, Ala. Code 1975 -- which also became effective on January 1, 2012.

In the present cases, MBN has not argued whether the <u>Frye</u> test may still have some limited application for expert testimony that is not covered by Rule 702(b), and I take no position on this issue.

proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge"). This allows the judge to act as the "gatekeeper" for what an expert witness will or will not be allowed to testify to. See Daubert, 509 U.S. at 597.

Practitioners in our state have recognized the difficulty in determining whether certain expert testimony is "based on a scientific theory, principle, methodology, or procedure," stating:

> "Rule 702(b) applies to expert testimony only if it is 'based on a scientific theory, principle, methodology or procedure.' Thus, Rule 702(b) does not apply to expert testimony based on 'technical' or 'other specialized knowledge.' Deciding whether a particular expert's testimony is or is not scientific is a difficult issue for Alabama judges and lawyers. 'Scientific' is not defined in Rule 702, and, after decades of applying the Frye [v. United States, 54 App. D.C. 46, 293 F. 1013 (1923),] standard (which applied only to novel scientific testimony), it is 'apparent that Alabama courts have not attempted to narrowly define the phrase "scientific test or experiment,"' but rather 'have been content to determine on a case-by-case basis whether proffered testimony implicates a scientific test or experiment.'[30]
>
> "_____
>
> "[30]See Robert J. Goodwin, Fifty Years of Frye in Alabama: The Continuing Debate over Adopting the Test Established in Daubert v. Merrill Dow Pharmaceuticals, Inc., 35 Cumb. L. Rev. 231, 245-46 (2005)."

Terrence W. McCarthy & Brooke G. Malcom, Alabama's Daubert

Amendment: An Overview of the Current State of the Law and Resources for the Practitioner, 79 Ala. Law 254, 260 (July 2018).

That said, our Court, quoting from the Eleventh Circuit Court of Appeals' decision in Carmichael v. Samyang Tire, Inc., 131 F.3d 1433, 1435-36 (11th Cir. 1997), has previously explained that the following is helpful in determining what is and is not scientific evidence:

> "'What, then, is the difference between scientific and non-scientific expert testimony? In short, a scientific expert is an expert who relies on the application of scientific principles, rather than on skill- or experience-based observation, for the basis of his opinion. See Daubert [v. Merrell Dow Pharmaceuticals, Inc.], 509 U.S. [579,] 590, 113 S. Ct. [2786,] 2795, 125 L.Ed.2d 469 [(1993)]. As the Sixth Circuit explained in Berry v. City of Detroit:

>> "'"The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.

>> "'"On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable witness if a proper foundation were laid for his conclusions. The foundation

> would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have."
>
> "'25 F.3d 1342, 1349-50 (6th Cir.1994); see also Sorenson v. Robert B. Miller & Assoc., Inc., Nos. 95-5085, 95-5086, [Sept. 10, 1996 (6th Cir. 1996) (not published in Federal Reporter)] (applying Berry). Thus, the question in this case is whether [the expert's] testimony is based on his application of scientific principles or theories (which we should submit to a Daubert analysis) or on his utilization of personal experience and skill with failed tires (which we would usually expect a district court to allow a jury to evaluate). In other words, is the testimony at issue in this case more like that of a beekeeper applying his experience with bees or that of an aeronautical engineer applying his more generalized knowledge of the scientific principles of flight?'"

Ex parte George, 370 So. 3d 591, 603 (Ala. 2021) (plurality opinion).

### II. Applying Rule 702, Ala. R. Evid., in the Present Cases

In the present cases, Cooley's testimony addressing the methods used by the Shelby County Tax Commissioner's Office to calculate and assess the values of commercial properties for ad valorem taxes is not based on her application of scientific principles or theories but is, instead, based on her training and experience as the chief appraiser.[8] Thus, under

---

[8]Although it is perhaps possible to argue that the "mass-appraisal" process is a scientific "methodology" or "procedure," the process of deciding what properties should be included in the process -- that is,

current Alabama evidentiary practice, the <u>Daubert</u> standard would not have been applied to her testimony in this case. Instead, it appears to me to have been properly admitted under the lower standard of Rule 702(a).[9]

Even so, there are good reasons to think that such testimony should be subjected to the <u>Daubert</u> standard. Why? Because it is possible that the methods used for calculating the assessed values for ad valorem taxes in this state -- as described by Cooley -- could result in skewed assessments, particularly where, as here, there is no rental information

---

"validated" -- does not seem scientific at all. Regardless, I need not decide such a question because MBN has not argued that Rule 702(b) should have been applied here.

[9]It is possible that Cooley's testimony might also have been admitted as lay opinion testimony, but it would likely have had far less impact on the jury as lay opinion testimony. Moreover, after reviewing the transcript of the trial below, I do not believe that this testimony was presented or admitted as lay opinion testimony at trial. ADOR clearly wished the jury to view Cooley as someone with expertise. Further, any such lay opinion testimony would still need to pass other admissibility requirements, and I express no opinion on whether it would have met such requirements. <u>See</u> Rule 701, Ala. R. Evid. (providing that lay opinion testimony is allowed if (among other things), it is "rationally based on the perception of the witness"). <u>See</u> <u>also</u> <u>Presley v. B.I.C. Constr., Inc.</u>, 64 So. 3d 610, 620 (Ala. Civ. App. 2009) (quoting <u>State v. Steele</u>, 374 So. 2d 325, 329 (Ala. 1979)) (explaining that "'[i]t is well-settled that any person, including a layman, is competent to testify to his opinion concerning the value of land if he has had an opportunity for forming a correct opinion and testifies in substance that he has done so'").

available for the buildings at issue.

Testimony offered by ADOR during trial indicated that, every year, the Shelby County Tax Commissioner's Office -- and, presumably, all county tax commissioner's offices in Alabama -- compile a sales-ratio study for the current tax year that includes all the appraised values and all the actual sales of "validated properties" in similar areas. After the per-square-foot values are calculated using those sales, they are then compared to appraised tax values in the area. That report is then submitted to ADOR, which does its own studies to ensure that a particular county is being "fair and equitable" in its assessments of real property in the area.

However, according to Cooley, the Shelby County Tax Commissioner's Office intentionally excludes all properties owned or purchased by a "trust" from its study, and, as a result, such properties can never be "validated properties." She explained that, if she does not exclude them, ADOR will ask her to remove them. In other words, excluding those types of properties from the study for assessment of the values of commercial properties may be standard practice across Alabama.

18

In these cases, MBN noted that there was at least one property -- the Inverness Center -- that was owned by a trust and was excluded from the Shelby County Tax Commissioner's calculations. MBN alleged that the Inverness Center was very similar to the buildings at issue here and, thus, should have been used as a comparable sale in determining the average square-foot price for the buildings at issue. Again, determining the value of commercial office buildings is particularly difficult because there are few comparable sales.

Even more troubling to me is that one type of commercial property that is intentionally omitted from the BOE's methodology is commercial property owned by a real-estate investment trust, known colloquially as a "REIT." A REIT is "[a] company that invests in and manages a portfolio of real estate, with the majority of the trust's income distributed to its shareholders." Black's Law Dictionary 1516 (11th ed. 2019). Many REITs are publicly traded and provide important benefits to investors and society. As a result, REITs have the ability to raise large amounts of capital to finance larger projects. In fact, much of the commercial real estate in the United States is owned by REITs.

It is self-evident that it takes more money to purchase a larger

commercial property and, thus, that REITs will, as a general matter, own larger commercial properties. Therefore, it is the larger commercial office buildings that are more often left out of the "validated properties" by ADOR and the BOE. Why is this important? Because even Cooley -- ADOR's own witness -- admits that, in general, the larger the building the lower the price per square foot.

By intentionally excluding REIT-owned commercial properties, it seems possible that the methods used for assessing the values of commercial properties for ad valorem taxes in Alabama is skewing the square-footage calculation in the mass-appraisal process toward a higher value. Had Cooley's testimony been subject to the <u>Daubert</u> standard, it might have been excluded because, among other reasons, it was neither "based on sufficient facts or data" nor, arguably, "the product of reliable principles and methods" because it omitted such REIT-owned properties. Rule 702(b).

I say "might" and "possible" because there was no <u>Daubert</u> hearing held by the circuit court to determine if excluding REIT-owned properties did in fact skew the assessments at issue in these cases. Thus, I do not (and need not) conclude that the valuations in these cases -- or that any

other valuations by the Shelby County Tax Commissioner that exclude consideration of REIT-owned property -- are inaccurate. Likewise, I cannot say whether the admission of such testimony directly led to the jury's determining a taxable value of Building 300 that was basically double its actual sales price in 2023. All I can say is that it concerns me.

Despite my concerns, however, the job of Alabama's courts, including this Court, is to apply the existing law. We are thus bound by Alabama's current evidentiary standards. Here, there seems to be little doubt that Cooley's testimony explaining the valuations at issue in these cases was properly admitted at trial under Alabama's existing evidentiary standards in Rule 702(a) and that, therefore, the jury could appropriately have relied on her testimony in reaching its verdicts here.

In my view, our citizens are entitled to the <u>most accurate</u> results by county tax-assessing officials and in the Alabama courts. Importantly, the Alabama economy works best when investors from Alabama and from across the nation are confident that they will receive predictable and accurate results in our courts. I thus make the above observations in the hope that the Legislature -- and, perhaps, the Standing Committee on the Alabama Rules of Evidence -- will consider whether Alabama should

21

adopt the <u>Daubert</u> reliability standard for all expert testimony regardless of whether it is scientific in nature. I also make the above observations in the hope that ADOR considers the question of whether it should include REIT-owned properties and certain trust-owned properties in its tax-assessment calculations.